WELLS, Admr., et al., Appellees and Cross–Appellants,

v.

MIAMI VALLEY HOSPITAL et al., Appellants and Cross–Appellees.

[Cite as *Wells v. Miami Valley Hosp.* (1993), 90 Ohio App.3d 840.]

Court of Appeals of Ohio,
Montgomery County.

No. 13298.

Decided Aug. 30, 1993.

842

844

*Frederick Davis, Jr.,* for appellees and cross-appellants.

*Larry Smith,* for appellants and cross-appellees.

FAIN, Judge.

The plaintiffs' decedent, Renee Wells, was treated by medical professionals at Miami Valley Hospital for preeclampsia, a serious, life-threatening condition associated with late pregnancy. Her treatment included a caesarian delivery and the insertion of a central venous pressure ("CVP") catheter. There was credible medical testimony to the effect that the improper placement of the CVP catheter caused a cardiac tamponade, in which the pericardium is filled with so much fluid from the misplaced catheter that the resulting pressure shuts the heart down, causing death. The plaintiffs' theory of the cause of death was simple—the treatment rendered by medical professionals at the hospital killed the patient, and no one did anything to stop it, even though the patient's declining vital signs made it clear that something was very wrong.

Although certain defendants were the beneficiaries of a directed verdict, a jury awarded a verdict in the amount of $602,587.80 against defendants-appellants Miami Valley Hospital ("MVH") and Dr. Deborah Miller. These defendants

moved for judgment notwithstanding the verdict and for a new trial. The trial court granted the new trial motion, but denied the motion for judgment notwithstanding the verdict.

Dr. Miller and MVH appeal from the trial court's denial of their motion for judgment notwithstanding the verdict. Appellees and cross-appellants Winfred Wells, Administrator of the Estate of Renee Wells, et al. ("appellees"), assert that the trial court erred by granting a new trial on the issue of liability and erred in directing a verdict in favor of defendants MVH and Dr. Jude Crino.

We conclude that there was sufficient evidence to support the jury's verdict on the proximate cause issue.

We find that the trial court properly denied MVH's motion for judgment notwithstanding the verdict and properly directed a verdict for Dr. Crino and MVH on the issue of Dr. Crino's failure to attend to Wells.

We also find that the trial court erred in granting MVH's motion for a new trial. Although appellees' experts failed to supply predicate facts in advance of offering their opinions, as required by Evid.R. 705, the experts supplied adequate facts after giving their opinion testimony on all determinative issues, so that each violation of Evid.R. 705 amounted to harmless error, except for one instance where expert opinion testimony came in without predicate facts. In that instance, the testimony was elicited by MVH during cross-examination, MVH having successfully objected to and moved to strike the same testimony on direct. Thus, the receipt of expert testimony without predicate facts on the one occasion where it occurred was invited error.

Finally, we conclude that the trial court erred in directing a verdict in favor of Dr. Crino and MVH, under theories of *res ipsa loquitur* and agency by estoppel, regarding the issue of the CVP catheter placement verification, where Dr. Crino was an employee of MVH at the time of the catheter placement, and where appellees met their burden of proof by showing that (1) Dr. Crino was one of the "OB Staff" who was in the operating room with Wells at the time of the placement of the CVP, (2) Dr. Crino was co-responsible for Wells's treatment, including treatment related to the verification of the placement of the CVP catheter, which was the shared responsibility between the "OB Staff" and anesthesiologists who are not parties to this action, (3) the failure to verify the placement of the CVP catheter probably fell below the applicable standard of care, (4) it was more likely than not that a proximate cause of Wells's death was the fluid from the CVP catheter accumulating in her pericardium, and (5) Wells probably would have survived had her vital signs been interpreted correctly as indicating that a recognized complication of treatment with the CVP catheter.

# I

Decedent Renee Wells was admitted to MVH, thirty-four weeks' pregnant and suffering from preeclampsia, a serious, life-threatening condition associated with late pregnancy and characterized by hypertension, proteins in the urine, and subcutaneous edema. Wells underwent a caesarean delivery that included the insertion of a central venous pressure ("CVP") catheter for venous pressure monitoring and fluid replacement, at a rate of about fifty cc's per hour. The caesarian was completed around 3:35 p.m. on November 16, 1987. The next morning, around midnight and again at 1:45 a.m., Dr. Deborah Miller, a second-year resident and employee of MVH, visited Wells and noted her rising CVP readings and falling blood pressure. Dr. Miller admitted that it was her plan to monitor Wells closely, yet Dr. Miller never saw Wells again.

At around 2:45 a.m., chief resident Dr. Jude Crino, who was present in the operating room during the caesarian and insertion of the CVP catheter, was summoned by nurses to evaluate Wells, whose CVP readings increased as her blood pressure continued to fall.

Dr. Crino examined Wells at around 3:00 a.m., ordered a dopamine drip started, and called an anesthesiologist to request that Wells undergo the placement of a Swan–Ganz catheter to monitor the performance of the left side of Wells's heart from the pulmonary artery. The anesthesiologist reportedly told Dr. Crino that he would see Wells later that morning. Wells suffered respiratory arrest shortly after 4:00 a.m., and died about an hour later.

The autopsy showed, among other things, five hundred cc's of fluid in the pericardium. The autopsy report listed preeclampsia as one of the causes of Wells's cardiac tamponade. The defendants' expert, Dr. Snyder, testified on cross that at 1:45 a.m., Wells no longer had hypertension, one of the cardinal symptoms of preeclampsia.

The trial court directed a verdict in favor of Dr. Crino and MVH on the issue of the placement of the CVP catheter, and dismissed Dr. Crino as a defendant. The jury then returned a verdict in the amount of $602,587.80 against Dr. Miller and MVH on the issue of failure to diagnose.

The trial court denied MVH's motion for a judgment notwithstanding the verdict but granted MVH's motion for a new trial and set aside the jury's verdict after finding that (1) appellees' expert opinion testimony failed to establish proximate cause and the probability that Wells would have survived as required in a wrongful death/failure to diagnose action, (2) appellees' expert opinion testimony violated Evid.R. 705 by failing to first set forth specific predicate facts,

and (3) a misstated word in the jury instructions "may have contributed to and/or resulted in a potential miscarriage of justice."

From the judgment of the trial court, both parties appeal.

## II

MVH's sole assignment of error is as follows:

"The trial court erred in denying defendants' motion for a judgment notwithstanding the verdict."

■ On a motion for judgment notwithstanding the verdict, the test is the same as for a directed verdict: the evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in the nonmoving party's favor; where there is substantial evidence supporting the nonmovant's case, on which reasonable minds may reach different conclusions, the motion must be denied; and the trial court, when ruling on a motion for directed verdict or a judgment notwithstanding the verdict, is not to weigh the evidence or the credibility of the witnesses. *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 28 OBR 410, 411, 504 N.E.2d 19, 21.

■ To maintain a wrongful death action on a theory of negligence, a plaintiff must generally show (1) the existence of a duty owed to plaintiff's decedent, (2) a breach of that duty, and (3) that the breach proximately caused death. *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 529 N.E.2d 449. The plaintiff must prove that the defendant's negligence, *in probability,* proximately caused the death. *Cooper v. Sisters of Charity of Cincinnati, Inc.* (1971), 27 Ohio St.2d 242, 56 O.O.2d 146, 272 N.E.2d 97. Proximate cause is a happening or event which as a natural and continuous sequence produces an injury without which the result would not have occurred. *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 575 N.E.2d 828. Where a failure to diagnose an injury allegedly prevented the patient from an opportunity to be operated on and eliminated any chance of the patient's survival, the issue of proximate cause can be submitted to the jury only if there is sufficient evidence showing that with proper diagnosis, treatment, and surgery, the patient probably would have survived. *Cooper,* 27 Ohio St.2d at 253–254, 56 O.O.2d at 152–153, 272 N.E.2d at 104–105.

■ The medical malpractice plaintiff must prove, by a preponderance of the evidence, that:

" * * * [T]he injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the

failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 131, 75 O.O.2d 184, 186, 346 N.E.2d 673, 677.

Proof of the recognized standards, unless the lack of skill or care is so apparent as to be within the comprehension of laymen and requires only common knowledge and experience to understand and judge it, must necessarily be provided through expert testimony, and the expert must be qualified to express an opinion on the specific, relevant standard of care. *Id.* at 130–132, 75 O.O.2d at 186–187, 346 N.E.2d at 676–678.

In its motion for a judgment notwithstanding the verdict, MVH asserted that even if appellees had proved that Dr. Miller owed and breached a duty to obtain a consultation regarding Wells's condition at 1:45 a.m., appellees failed to prove that the treatment given was inferior to the treatment that she would have received with another physician under like circumstances. However, no treatment was given. If no treatment, in a particular situation, meets the standard of care, then a plaintiff can have no recovery. Where no treatment violates the standard of care, showing what should have been done in lieu of no treatment is implicit in the identification of the relevant standard of care.

Appellees, however, went beyond implication in seeking to prove that Dr. Miller failed to diagnose, failed to obtain a consultation, or failed to closely monitor Wells as the situation required. Appellees identified the relevant standard of care, showed that it was not met, and demonstrated what could have been done to save Wells.

Appellees' experts produced sufficient testimony that Wells was in a high-risk room of a tertiary care facility, that she probably died from a cardiac tamponade caused by the CVP catheter leaking fluid into her pericardium, and that (1) Wells presented a rising CVP and falling blood pressure over several hours before being visited by second-year resident Dr. Miller, who was in charge of Wells and who should have known that the trend of falling blood pressure was inconsistent with preeclampsia [1] and consistent with an impending cardiac tamponade that was a known medical risk of CVP catheter placement, (2) Dr. Miller made no attempt to diagnose or seek a consultation and admitted never seeing Wells again despite her plan to monitor Wells "closely," and (3) lowering the CVP fluid bag or discontinuing the fluid flow, presumably in combination with Dr. Miller's staying with the patient to see if a reversal or cessation of flow from the CVP line

---

1. MVH expert Dr. Snyder admitted under cross-examination that Wells no longer had hypertension, a cardinal sign of preeclampsia, at 1:45 a.m.

affected Wells's blood pressure readings, would have quickly and efficiently alerted Dr. Miller to a problem with the CVP.[2] We do not agree that appellees failed to demonstrate how Dr. Miller's care was inferior to care that was owed to a patient like Wells.

MVH also argues that the trial court's finding that appellees' experts failed to fix the time of "last chance" to salvage Wells justifies, under *Cooper*, a judgment notwithstanding the verdict for MVH. We disagree.

In *Cooper*, the decedent suffered injuries outside the hospital that were not discovered by medical personnel until after the patient died, and the expert witness failed to testify that, had the decedent undergone surgery, he would have had a greater than fifty-percent chance of survival. *Cooper, supra.* Nowhere in *Cooper* do we find that expert testimony must also fix, to a probability, a time after which the patient was no longer salvageable.

■ If an expert shows that (1) the patient probably would have survived without the wrongful act or omission of the malpractice defendant, (2) the wrongful act or omission was a probable proximate cause of the patient's death, and (3) the effects of the act or omission were or should have been discoverable by the defendant before the patient became unsalvageable, that is enough, under *Cooper*, to send the issue of proximate cause to the jury. It is not necessary for the expert to identify the precise moment, or even the approximate moment of last chance, when the patient drifts beyond physical salvation.[3]

■ The Ohio Supreme Court declined, in *Cooper*, to approve lesser standards of proof regarding proximate cause. The "strong intuitive sense of humanity" that injured persons "should be compensated for the loss of any chance of survival, regardless of its remoteness," was thought to probably "produce more injustice than justice." *Cooper*, 27 Ohio St.2d at 251–252, 56 O.O.2d at 150–151, 272 N.E.2d at 103. However, *Cooper* cannot be read to require greater standards of proof without working a reciprocal injustice. A requirement that an

---

**2.** Expert testimony indicated that the CVP fluid flow could have been reversed if the CVP bag was lowered beneath the level of the patient. The implied argument from appellees is that Dr. Miller should have realized that Wells was no longer suffering from preeclampsia when her hypertension abated at 1:45 a.m. and that one easy way to discover that there was a problem with the CVP catheter would have been to reverse or discontinue the fluid flow and then to stay with the patient to see what effect that had upon her vital signs.

**3.** "Last chance" is not the same as the doctrine of "lost chance," the loss of an opportunity for a more favorable result, although the opportunity lost was less than fifty percent—a doctrine that was rejected in *Cooper*—but instead is literally a patient's "point of no return," necessary to ascertain to a probability only where it is claimed that the negligence occurred *after* the patient was not salvageable. Otherwise, to go to the jury under the *Cooper* standard, negligence must have probably been a proximate cause of the patient's injury or death before the last chance of the patient to avoid the injury or death.

expert fix the precise minute or hour of "last chance" would, in many instances, go against "[t]raditional proximate cause standards [that] require that the trier of the facts * * * be provided with evidence that a result was more likely than not to have been caused by an act, in the absence of any intervening cause." *Cooper*, at 251, 56 O.O.2d at 150, 272 N.E.2d at 103. We find that a patient's time of "last chance" to avoid injury or death is not required to be proven by a plaintiff's expert to a probability unless it is essential to prove proximate cause or the probability of the patient's survival with proper care.

 Here, it was not necessary for appellees' experts to provide probability testimony on the time of the last chance for Wells to have been saved. Evidence in the record strongly tended to show that removing the fluid buildup from the pericardium could have saved Wells even after she went into cardio-respiratory arrest.[4]

We agree with MVH's position, articulated during the oral argument of this case, that the lethal medical treatment—the improper placement of the CVP catheter—was rendered by someone other than Dr. Miller (for whom MVH would be vicariously liable as the employer), and, therefore, because Dr. Miller inherited the improperly placed CVP catheter from her predecessor, in patient care, it is just as if the improper placement were some naturally occurring phenomenon, outside the realm of medical treatment, that was imperilling the patient. Pursuant to the holding in *Cooper*, the plaintiff must prove that the subsequent care provider failed in a duty to the patient, and that the patient would probably have survived the mistreatment by the earlier care provider had the subsequent care provider not failed in that duty.

The trial court characterized the appellees' expert testimony as follows, in pertinent part:

"After careful reading by this Court of the testimony given by Dr. Ucker * * * the Court finds that Dr. Ucker testified that, had Dr. Miller obtained a timely consultation, then 'presumably' Dr. Crino 'could' have saved Wells' life. The Court thus finds that such testimony is similar to that which was found insufficient in [*Shumaker*] [cite omitted]. Similarly, Plaintiff's other expert, Dr. Knapp, testified that, had timely consultation been obtained, 'it is a very strong *chance* that Renee Wells *could* have been saved * * *.' This Court finds that said testimony does not meet the necessary element of proximate cause, as said

---

**4.** It is significant that MVH argues that part of the protocol to revive patients like Wells, who suffer cardio-respiratory arrest, is to perform pericardial centesis as a means of saving their lives. MVH medical personnel attempted two centesis procedures on Wells after she stopped breathing. Presumably, the protocols for dying patients do not involve procedures that have no chance of success. The inescapable conclusion is that, albeit for a short time, Wells was salvageable even after she stopped breathing.

testimony does not establish that Wells *probably would* have survived with proper diagnosis and treatment. Furthermore, while Drs. Knapp and Ucker testified that Dr. Miller's negligence occurred at 1:45 a.m., Dr. Knapp indicated that he could not render an opinion whether Renee Wells was probably salvageable beyond the period of 11:30 p.m. to 12:00 midnight; but there was a 'chance' that Renee Wells 'might' have been salvageable after 12:00 midnight, however, the chance was disappearing, and he was unable to give the final time between 12:00 midnight and 4:00 a.m. that Renee Wells 'could' have been salvaged." (Emphasis added.)

Upon reviewing appellees' expert opinion testimony, we conclude that appellees' experts provided sufficient testimony to meet the *Cooper* standard on proximate cause.[5] On the issue of whether Wells would have survived, Dr. Ucker produced sufficient testimony on direct.

Regarding proximate cause, appellees' experts testified that, in effect (1) a rising CVP and a falling blood pressure over a few hours' time are signs that something serious and unrelated to preeclampsia was happening to Wells; (2)

---

5. Dr. Ucker testified on direct, in pertinent part:

"Q. Doctor, with regard to the proximate cause of death, did you reach an opinion, based on reasonable medical probability?

"A. Yes, sir.

"Q. What is that opinion?

"[Objection, overruled]

"A. There is a whole sequence of events. What happened first was she had the patient having surgery. The condition for which she had the surgery and pregnancy are not what caused her death. The central venous pressure line was inserted, and it ruptured through the pericardial sac. It could be from the superior vena cava. It could be from the right atrium. But the tip of the catheter was in there. It was dripping fluid at 50 cc's per hour, as ordered. This went on for seven-and-a-half hours, something like that anyway. How fast it was flowing at that time, I don't know, because those things can't be controlled precisely. But in any case, this caused fluid to be put into the pericardial sac, as I mentioned previously.

"* * *

"Q. And with regard to the failure to timely seek the consultation, do you have an opinion as to whether that proximately caused Renee Wells' [*sic*] death?

"[Objection, overruled]

"A. Yes.

"Q. What is that opinion?

"A. That it did.

"[Move to strike, overruled.]"

Dr. Knapp testified on direct, in pertinent part, as follows:

"Q. Doctor, do you have an opinion based on a reasonable degree of medical certainty as to whether or not the failure of Dr. Miller timely seeking consultation proximately caused the death of Renee Wells?

"A. Yes, I do.

"Q. What is that opinion?

"MR. SMITH: Objection.

"A. Yes, it did.

"THE COURT: Overruled."

these changes in Wells's vital signs were symptomatic of impending cardiac tamponade and a more experienced doctor than second-year resident Dr. Miller should have realized that one of the recognized complications of CVP catheter placement was cardiac tamponade; (3) Dr. Miller failed to come up with a plan to treat Wells at 1:45 a.m. and failed to return to see Wells again; (4) and to a reasonable degree of medical certainty, Dr. Miller's failure to diagnose or seek consultation proximately caused Wells's death.

As to the cause of death being from cardiac tamponade, Dr. Knapp testified, in relevant part, that:

"When the fluid backs up on the outside of the heart, it necessarily starts backing up throughout the entire body. It backs up and is forced out into the tissue, and the organs get edematous and boggy, but it shouldn't be outside the heart. * * * Even with preeclampsia, there is a certain amount of protein that comes through the blood vessels. Even with that, it has not been seen over all the years and all the preeclamptics that have been taken care of and studied, you just haven't seen fluid collection around the heart as a result of preeclampsia."

On the issue of probability of survival, Dr. Ucker testified, regarding the two failed attempts at pericardial centesis performed on Wells after she had suffered respiratory arrest, that "had he been called sooner, presumably he could have done the same thing early enough to save her life." The trial court misapprehended "presumably" as a word indicative of a less than probable outcome. "Presumable" literally means "probable." [6]

Merely saying "could" is insufficient to show probability under *Cooper*, but expert opinion testimony that an event "presumably could" have occurred is equivalent to saying "probably could" and is sufficient to meet the *Cooper* standard of "more likely than not." Contrast this with the phrase, "a reasonable degree of probability," modifying the word "could," that was held not to satisfy *Cooper* in *Shumaker v. Oliver B. Cannon & Sons, Inc.* (1986), 28 Ohio St.3d 367, 28 OBR 429, 504 N.E.2d 44.

Saying a "reasonable degree of probability" is not the equivalent of saying something is probable. The word "degree" implies that "probability" is being measured, that is, that "probability" is being assigned a quantitative value in the range from zero to one, where zero is assigned to the condition in which an event cannot possibly occur, and one is assigned to the condition in which an event is absolutely certain to occur. Thus, whether something would have or could have happened to a "reasonable degree of probability" fails to specify a more likely

---

6. "Presumable" is defined as "taken for granted; probable." Webster's New World Dictionary (2 College Ed.1986) 1126.

than not outcome. Here, Dr. Ucker did not modify presumably with "a degree," and, unlike the expert in *Shumaker*, did not fail to meet the *Cooper* standard on the issue of survival.

■ Dr. Knapp also testified on the symptoms of cardiac tamponade, stating that "it is a very strong chance that Renee Wells could have been saved had all this been discovered and reasoned out earlier." A "very strong chance" is a phrase that seems to indicate a more likely than not probability in this context. However, we cannot say that a "very strong chance" is greater than fifty percent any more than we can say the opposite is true. While a reviewing court can decide issues of semantics by construing phrases in their proper context, the court cannot add or subtract language to reach a particular result, even where such a result seems overwhelmingly fair and just.

While there are no magic words for establishing a more than fifty-percent probability, there are some words, left unmodified, that are obviously insufficient to establish probability, such as "could" or "chance." We think that "very strong chance," unmodified, is too speculative to accurately state in terms of probability. However, on cross-examination, Dr. Knapp met the *Cooper* standard on the issue of probable survival:

"Q. Let me ask you this, Doctor. Give me the last point in time, if you are able, at which you are able to give an opinion within a reasonable medical probability that Renee Wells could have been salvaged.

"A. I can tell you that at the time she went into cardiac arrest, I do not believe she could have been salvaged. I can tell you I believe there is a time after 12:00 o'clock that she could. What I can't give you is that point between 12:00 and, I believe, about 4:00 a.m. where the probability slips below. That I can't tell you."

Appellees met their burden under *Cooper* so far as providing expert opinion testimony on the probability that MVH's employee, Dr. Miller, proximately caused Wells's death. Appellees also established, through Dr. Ucker's expert testimony, that Wells would have probably survived with proper care and treatment.

MVH also argues that appellees' expert, Dr. Knapp, failed to qualify himself as an expert on the relevant obstetrical standard of care, particularly because Dr. Knapp testified that he was not "familiar with everything an obstetrician does" and that he was familiar with the standard of care that is applicable to obstetricians in the intensive care setting "to some extent." Dr. Knapp, an anesthesiologist and former Director of Obstetrics Anesthesia at the University of Cincinnati, also testified that he regularly worked and consulted closely with obstetricians in intensive care units.

 Differences in areas of specialization go to the weight of the evidence. *King v. LaKamp* (1988), 50 Ohio App.3d 84, 553 N.E.2d 701. The test of admissibility is whether a particular witness offered as an expert will aid the trier of fact in the search for the truth, not whether the expert witness is the best witness on the subject. *Ishler v. Miller* (1978), 56 Ohio St.2d 447, 10 O.O.3d 539, 384 N.E.2d 296. The competency of an expert witness is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Ohio Turnpike Comm. v. Ellis* (1955), 164 Ohio St. 377, 58 O.O. 179, 131 N.E.2d 397.

 We find no abuse of discretion by the trial court on the issue of Dr. Knapp's competency to testify on the obstetrical standard of care for a high-risk patient. There is no question that Dr. Knapp's knowledge and experience in obstetrics anesthesiology were genuine, substantial, and would assist the jury.

For all of the foregoing reasons, we conclude that the trial court correctly denied MVH's motion for judgment notwithstanding the verdict. There is substantial evidence supporting appellees' case upon which reasonable minds could differ.

MVH's sole assignment of error is overruled.

### III

We construe appellees' first assignment of error to be as follows:

 "The trial court committed reversible error by ordering a new trial on the issue of liability."

Where a trial court is authorized to grant a new trial for a reason which requires the exercise of sound discretion, the order granting a new trial may be reversed only upon a showing of abuse of discretion by the trial court. *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685. However, where a new trial is granted by a trial court for reasons not involving any exercise of discretion but instead involving a decision on a question of law, the order granting a new trial may be reversed upon a showing that the decision was erroneous as a matter of law. *Id.*

Appellees argue that the trial court erroneously characterized the expert testimony of Drs. Ucker and Knapp as inadmissible under Evid.R. 705, for lack of a factual foundation, and that the error in the jury instructions was harmless and did not cause manifest injustice. The trial court found that:

"Under Evidence Rule 705, an expert witness is permitted to state his opinion only after he first discloses the facts or data upon which he relies in formulating his opinion. While the opinion need not take the form of a hypothetical question,

the jury must still be advised of the specific facts upon which the expert opinion is based. [Citations omitted.] Rather than stating the specific facts upon which he based his opinion, Dr. Ucker simply indicated that he had reviewed and relied upon the autopsy report, the hospital chart, and several depositions that had been taken, but not filed or read at trial. In light of Dr. Ucker's failure to state the factual basis of his opinions, the objections of defense counsel should have been sustained and the opinion excluded. At trial, the Defendants' objections were overruled because the Court believed that the failure to state the specific facts underlying the opinion would go to the weight of the opinion rather than its admissibility. However, upon reflection of the entire trial, and the lack of evidence on the crucial issue of proximate cause, it is apparent that the weight of Dr. Ucker's opinions could not be properly evaluated and weighed by the jury without the doctor's being required to set forth the specific facts underlying his opinion. * * * Dr. Knapp's testimony also violated Rule 705 in that it did not set forth the specific facts upon which he relied in formulating his opinions. Dr. Knapp was also permitted to state his opinions without first setting forth the specific facts upon which he relied in formulating those opinions. Dr. Knapp, like Dr. Ucker, testified that he had reviewed various materials and records. Dr. Knapp also testified as to factual information and inferences that he drew from those materials and records. However, at no time did Dr. Knapp state that he was relying upon any particular set of facts in formulating his opinions. Expert testimony which is presented in this fashion gives the appearance, at trial, that Evidence Rule 705 is being satisfied, when it is not."

Evid.R. 705 provides:

"The expert may testify in terms of opinion or inference and give his reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise."

■ The admissibility of expert opinion testimony is committed to the sound discretion of the trial court and will provide a basis for reversal on appeal only upon an abuse of that discretion which amounts to prejudicial error. *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 524 N.E.2d 881. However, the abuse of discretion standard is inapplicable when an issue of law is the basis for the grant of a new trial. *Monroe v. Ohio Dept. of Rehab. & Corr.* (1990), 66 Ohio App.3d 236, 583 N.E.2d 1102.

■ Expert opinion testimony must be based upon facts within the witness's own personal knowledge or upon facts shown by other evidence. *State v. Chapin* (1981), 67 Ohio St.2d 437, 21 O.O.3d 273, 424 N.E.2d 317. Expert opinion testimony may not be based upon evidence the expert has heard or read on the assumption that the facts supported thereby are true, where such evidence

is voluminous, complicated, or conflicting, or consists of opinion, inferences, and conclusions of other witnesses. *Zelenka v. Indus. Comm.* (1956), 165 Ohio St. 587, 60 O.O. 524, 138 N.E.2d 667.

"By requiring the expert to specify the particular facts upon which he relies prior to rendering the opinion itself, Ohio Rule 705 represents an extension of orthodox pre-Rule practice. Requiring the expert to inform the jury of the basis supporting his or her opinion is both sensible and logical. [Footnote omitted.] The opinion would be irrelevant and misleading if grounded on facts ultimately discounted by the trier of fact. [Footnote omitted.] Thus, the trier of fact cannot adequately assess the validity of expert testimony without knowing the particular facts which support the expert opinion. By requiring disclosure of the facts or data underlying the opinion prior to rendering the opinion, Ohio Rule 705 seeks to aid the trier of fact in its assessment of the validity of the expert's opinion." 1 Weissenberger's Ohio Evidence (1993) 18, Section 705.2.

█ We note that the assessment of the validity of expert testimony continues after the case is submitted to the jury. Where specific facts are given *after* the expert opinion, provided that the facts are eventually admitted into evidence, the error is harmless unless some prejudicial effect is identified.

█ Here the medical records and scholarly medical articles on cardiac tamponade risks from CVP catheter placement were properly admitted into evidence. MVH argued that, on all or at least one determinative issue, appellees' experts failed to identify the specific factual basis for their opinions, and therefore violated the rule in *Zelenka.*

We now examine the testimony relevant to the trial court's finding that appellees' experts violated Evid.R. 705 by stating predicate facts after giving their opinions.

First, Dr. Ucker was asked if, based on his review of the chart, the autopsy report, and other matters, he "arrive[d] at an opinion?" Dr. Ucker responded that he had arrived at "several opinions," and revealed another basis for his opinions as "all or most of the depositions." Dr. Ucker was then asked if he had an opinion on whether a deviation from the standard of care proximately caused Wells's death. After responding that he did, Dr. Ucker was asked to first "tell us what facts you considered in reaching that opinion." Although Dr. Ucker responded somewhat obliquely, at one point saying that he could not remember all the facts he based his opinion on, and another time indicating that he considered "the whole array of facts in that case," Dr. Ucker did give the following as his factual basis for his testimony concerning the violation of the standard of care and proximate causation issues: (1) the CVP readings and other facts contained in the medical record, including the times when doctors came in to

see Wells, (2) the lack of an x-ray to verify the placement of the CVP catheter, and (3) the lack of any substantial treatment given to Wells between 1:45 a.m. and her respiratory arrest around 4:00 a.m. Dr. Ucker also cited, as a predicate fact, the five hundred cc's of fluid found in Wells's pericardium on autopsy. All of these facts were sufficiently specific and were produced before Dr. Ucker's opinion testimony on determinative issues. MVH argued that Dr. Ucker improperly based his opinion testimony on the medical record because such testimony was too general, the medical literature was not yet in evidence, and was improper hearsay. We disagree. We note that facts from medical records are presumed to be accurate and true. Expert opinion testimony based on data in medical records, as opposed to recorded physician opinions in medical records, is valid. Evid.R. 703. Where medical records are not admitted into evidence by an agreement of the parties, the business record exception to the hearsay rule would allow such records in. Evid.R. 803(6). Even if appellees' experts had not personally viewed medical data, that fact would go to the weight rather than to the admissibility of the expert's opinion. See *Blakeman v. Condorodis* (1991), 75 Ohio App.3d 393, 396, 599 N.E.2d 776, 778.

After appellees' counsel asked Dr. Ucker to explain to the jury how the failure of timely consultation proximately caused Wells's death, the trial court sustained an objection, finding that the predicate had "not been testified to by the witness," despite the fact that Dr. Ucker had just told the jury that the factual basis for his opinion was the medical record. Dr. Ucker specifically detailed the predicate for his opinion testimony as the data in the medical records: the recorded lack of physician action to verify the catheter position or to take some action when the CVP and blood pressure readings, in Dr. Ucker's expert opinion, demonstrated that Wells's condition was worsening.

Appellees' counsel, instead of getting Dr. Ucker to restate the predicate facts, asked Dr. Ucker if he had previously testified that one of the deviations from the standard of care was the failure of Dr. Miller to timely get a consultation. At that point, the trial court overruled an objection and Dr. Ucker answered affirmatively.

Dr. Ucker was then asked if he had reached an opinion on the proximate cause of Wells's death and what that opinion was. To both questions, Dr. Ucker answered affirmatively after the trial court overruled objections. Then, after Dr. Ucker testified that the failure to timely seek a consultation was a proximate cause of Wells's death, Dr. Ucker was asked to explain to the jury "how that occurred, what the relationship was?"

Dr. Ucker then described how Wells had suffered respiratory arrest and that the only reason two attempts at pericardial centesis were made was because someone at MVH "knew or had every reason to believe" that "there was

excessive pericardial fluid" and that "removing it would have helped the patient." Dr. Ucker followed that testimony with his statement that, had the doctor who performed the pericardial centesis been called earlier, he "presumably could have done the same thing early enough to save her life."

Then Dr. Ucker answered affirmatively when asked if he were familiar with the standard of care, based on his experience and training. This testimony correctly provided an opinion on the standard of care that was set forth after the jury was told of the specific facts upon which the opinion was based.

Finishing on direct, Dr. Ucker was asked what type of treatment he would expect Wells to receive in MVH's high-risk room. The trial court overruled an objection, saying that it "relates to the standard of care." Dr. Ucker then answered that "it is essentially the same kind of care one would expect in an intensive care unit."

We find no prejudicial violation of Evid.R. 705 in Dr. Ucker's testimony. The jury was ultimately apprised of the specific predicate facts of Dr. Ucker's opinions.

We next examine the testimony of Dr. Knapp, who indicated that the factual basis of his testimony was his review of the medical records and the autopsy report. Dr. Knapp then testified that he did research by reading articles on pericardial effusion relating to preeclampsia and on cardiac tamponade relating to CVP catheters. Dr. Knapp followed by explaining cardiac tamponade to the jury. Next, Dr. Knapp gave his expert opinion that Wells probably died of a cardiac tamponade. The trial court overruled an objection for lack of foundation. Dr. Knapp was then asked to tell the facts he considered when reaching this opinion, and he cited the presence of pericardial fluid and the lack of a CVP placement verification.

Following several questions, Dr. Knapp was again asked if he had an opinion on the proximate cause of Wells's death. After the trial court overruled an objection for no foundation, Dr. Knapp answered affirmatively. It was clear at that point that Dr. Knapp based his opinion on specific data in the medical records and autopsy reports.

Dr. Knapp was next asked about Wells's CVP and blood pressure readings. Dr. Knapp told the jury that he had read the medical report before testifying that there is a medically recognized relationship between rising CVP readings and a falling blood pressure: cardiac tamponade. Dr. Knapp testified that as the heart continues to compensate for not being able to push enough blood out with each stroke, the heart rate rises, and that Wells's medical record shows that she experienced an increased heart rate during the time when her CVP readings were rising. Dr. Knapp was then asked if he had an opinion on whether it was

negligent not to verify the placement of the CVP line. The trial court sustained an objection on a lack of foundation, finding that "there has not been testimony of this witness's familiarity with the standard of care in that regard."

Appellees' counsel proceeded to ask Dr. Knapp a series of questions on the standard of care. Dr. Knapp testified that the medical records indicated that MVH was a tertiary care center, and that such a hospital "holds itself out to the surrounding hospitals as being a place where they can send patients that are at risk, obstetric patients that have diseases or are at risk from various medical problems which those outlying hospitals are not equipped to handle. It is sort of a referral hospital for a region."

Dr. Knapp then testified that he was familiar with the standard of care of tertiary care hospitals and that he acquired that familiarity from his training at three different tertiary care hospitals. Finally, Dr. Knapp was asked if the failure to verify the CVP line violated the standard of care. The trial court considered two objections at that point, sustaining one as to the form of the question, and, after appellees' counsel rephrased the question, sustaining another as to the applicable standard of care. The trial court indicated that it did not know which standard of care was being discussed. Appellees' counsel again reformulated the question:

"Q. Let me restate it. I am going to be asking—so I won't have to repeat everything, I am going to ask that these opinions be based on your background, your training, your education, and your experience. Do you understand that?

"A. Yes.

"Q. And, also, to be heard by the jury, they have to be based on reasonable medical probability. Do you understand what I mean by that?

"A. I believe so.

"Q. My question is based on that background, that training and education, and given the standards I just told you, do you have an opinion as to whether the failure to verify the placement of the CVP line deviated from the standard of care that is applicable to tertiary care hospitals?"

Whereupon another objection was sustained, the trial court characterizing the question as "overbroad." Appellees' counsel asked Dr. Knapp several questions about his experience. After establishing that he practiced medicine and OB anesthesia as a licensed physician over the past year at least seventy-five percent of the time, Dr. Knapp answered that he was familiar with the standard of care with regard to the placement of CVP lines, and then gave his opinion that the failure to verify the placement of the CVP line violated the standard of care. Dr. Knapp was then asked what he based that on, and he answered as follows:

"Generally, my experience, reading the medical literature, reading literature on anesthesia. That is a widely accepted standard of care. We have gone through a lot of—we have had a lot of information disseminated on that very subject. That is a very, very strong standard of care."

It is reasonable to infer that part of a physician's experience is to stay current by reading medical literature. Experts rely on their experience and education to assist the trier of fact. We do not think that Dr. Knapp's indication that he relied, in part, on medical literature properly admitted into evidence to come to the conclusion that the standard of care required verification of the placement of the CVP line rendered his testimony on the standard of care inadmissible. Even if that portion were inadmissible, Dr. Knapp had previously testified to his personal familiarity and experience with tertiary care centers.

■ An expert doctor is entitled to express an opinion on causation in response to a hypothetical question that assumes the validity of medical records in evidence. *Condorodis,* 75 Ohio App.3d at 396, 599 N.E.2d at 778. In *Condorodis,* the expert doctor did not personally view the medical records. As the appeals court noted, the fact that the doctor did not personally view the medical records goes to the weight, not to the admissibility, of the evidence. *Id.*

Here, Dr. Knapp had previously indicated that he had reviewed the medical records. Moreover, Dr. Knapp's experience in tertiary care centers also qualified him to give an expert opinion on the standard of care involving the placement and monitoring of CVP lines.

Next, after the jury viewed a videotape illustrating the placement of a CVP line, Dr. Knapp was asked:

"Q. Sir, with regard to your opinion that Renee Wells suffered a cardiac tamponade, is one of the facts you based that on the placement of the CVP line?

"A. Yes.

"Q. And could you explain to the members of the jury how that fact along with the other facts you relied upon came together to cause cardiac tamponade?"

An objection was overruled and Dr. Knapp described the mechanism of the injury, namely, that the tip of the catheter somehow fed fluid into the pericardium.

Such an explanation was made to assist the jury. Dr. Knapp had already given his opinion testimony on the determinative issues of the standards of care of tertiary care facilities and CVP placements, and proximate cause. Included in the explanation was Dr. Knapp's reading, from the medical record, of the fifty cc's of fluid being administered to Wells hourly via the CVP line.

Dr. Knapp was then referred by counsel to the critical care flow sheet, from Wells's medical records, that showed the times and vital sign readings. Dr. Knapp was asked a series of questions about the vital sign progression and what it meant or should have meant to the physicians in charge of Wells. The trial court then held an evening recess. Apparently, Dr. Knapp was unable to return to court for three days. When direct examination resumed, appellees' counsel asked Dr. Knapp if he remembered that three days earlier they had just completed review of the critical care flow sheet. Dr. Knapp answered affirmatively. With the expert (and presumably the jury) so oriented, appellees' counsel attempted to ask Dr. Knapp about whether Dr. Miller violated the standard of care by not seeking consultation at 1:45 a.m. The trial court sustained several objections, finding that Dr. Knapp had not testified that he was familiar with the standard of care of obstetricians and obstetrics medicine.

Dr. Knapp was then asked if he was familiar with the standard of care, and he responded that he was "familiar with what goes on in obstetrics ICU from the point of view of an anesthesiologist." Dr. Knapp also allowed that he "couldn't say" he was "familiar with everything an obstetrician does." When asked if he was familiar with the standard of care that is applicable to obstetricians in an ICU setting, Dr. Knapp answered: "To some extent, yes."

The trial court overruled an objection that Dr. Knapp still had not been properly qualified as having knowledge of the standard of care of an obstetrician, concluding that Dr. Knapp's testimony was still "a bit nebulous" and that it could be "explored on cross." Dr. Knapp then testified that "Dr. Miller should have obtained consultation in the absence of having a firm idea of what was going on" and that the standard of care had been violated. When Dr. Knapp was asked to explain why Dr. Miller should have obtained consultation, Dr. Knapp cited Wells's vital signs, her blood pressure, CVP, and heart rate as "unmistakably leading in the direction of showing that she was getting in severe difficulty." A motion to strike was then overruled by the trial court.

Dr. Knapp continued, testifying that he was familiar with the CVP placement verification standard of care and that in his opinion the failure to verify the position of the catheter by chest x-ray fell below the applicable standard of care. Again, a motion to strike was overruled.

Finally, Dr. Knapp testified, based on the facts he had testified to previously and his review of the chart, that in his opinion Wells died of cardiac tamponade. When asked to explain to the jury how he reached that conclusion, Dr. Knapp testified:

"The combination of two things, really. The finding at autopsy of what was really a very large amount of fluids surrounding the heart at autopsy, combined with her vital signs for several hours preceding her death which presented a very

typical picture of cardiac tamponade. Those were the two—those are the two most striking pieces of evidence for her death by cardiac tamponade."

After a few more questions, MVH's counsel objected to Dr. Knapp's testimony on the grounds that the facts had not been given before the opinion testimony. In overruling the objection, the trial court noted that:

"The witness recited the last time he was here in Dayton all of the review and factual material that he reviewed."

The testimony then refocused on the standard of care, and Dr. Knapp was asked if he were familiar "with the standard of care that is applicable to the verification of CVP catheters to determine the safety of their position when a catheter is placed in a patient such as Renee Wells in a surgical suite when the patient has been given a C-section and a CVP line has been placed interoperatively?"

Dr. Knapp responded that he understood the facts as stated and he was familiar with the standard of care, before indicating that CVP verification would be a "shared responsibility between the anesthetist and the obstetrics team." Another objection was overruled.

Dr. Knapp was then asked about the fluid in the pericardium as indicated by the autopsy report. He testified that the excess pericardial fluid was not seen with patients with preeclampsia. On redirect, Dr. Knapp testified that the rise in CVP was serious because it occurred over a few hours, as opposed to days.

The only issue upon which Dr. Knapp provided an expert opinion without stating a factual basis was the probability of Wells's survival. This opinion testimony appears twice, on direct and during cross-examination.

On direct, the relevant testimony was as follows:

"Q. What is that opinion, Doctor?

"A. The failure to seek consultation, I believe did contribute to Renee Wells's death.

"Q. How?

"Mr. Smith: Objection. Move to strike, Your Honor.

"The Court: Overruled.

"A. The symptoms * * * were such that someone familiar with cardiac tamponade * * * would have recognized the process that was going on back before it progressed to full cardiac arrest. Had that happened, it is a very strong chance that Renee Wells could have been saved had this all been discovered and reasoned out earlier.

"Mr. Smith: Objection. Move to strike, Your Honor.

"Mr. Davis: Dr. Knapp—

"The Court: Just a minute. There is an objection pending. The Court is clueless as to the grounds for the objection, since they are not stated. Overruled.

"Q. Doctor, is that opinion you just related based also on the facts you previously testified to as well as your review of the chart?

"Mr. Smith: Objection.

"The Court: Overruled. Mr. Smith, unless grounds are stated for these objections, they are all ineffective to raise an issue.

"Mr. Smith: I can state the grounds, Your Honor.

"The Court: If you have them.

"Mr. Smith: Yes. Ohio law specifically requires that before an opinion is given, all facts upon which that opinion is based must be given either in a hypothetical form or by a factual basis. That, among others, is the grounds for my objection. As to the last question, the witness begins to get out of the area of probable cause and is using terms like might have.

"The Court: I understand the second ground. The first grounds are over-ruled. The witness recited the last time he was here * * * all of the review and factual material * * *. That objection is overruled. It is sustained as to the question about might have or could have. We will sustain the objection in that regard."

When the trial court sustained the objection, Dr. Knapp's opinion that Wells "could have been saved" was effectively stricken from the record. Although the objection and motion to strike were not initially sustained, no intervening answer came from Dr. Knapp. Once this portion of Dr. Knapp's testimony was stricken, the issue of Wells's survival did not recur during the rest of Dr. Knapp's direct examination or on redirect.

Dr. Knapp's testimony on all other determinative issues shows no prejudicial violation of Evid.R. 705, even where, like Dr. Ucker, he occasionally supplied predicate facts after giving an opinion. The only instance where Dr. Knapp's expert opinion testimony lacks predicate facts occurs during cross-examination conducted by MVH.

It is well settled in Ohio that a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make. *Lester v. Leuck* (1943), 142 Ohio St. 91, 26 O.O. 280, 50 N.E.2d 145. Because it was MVH, on cross-examination, that elicited Dr. Knapp's opinion that Wells would have survived with proper care, and because MVH successfully excluded Dr. Knapp's opinion on the same issue during direct examination, the invited error doctrine applies here. Because Dr. Knapp's expert opinion on the determinative issue of

the patient's survivability was elicited solely on cross-examination, MVH cannot complain that that opinion should have been excluded for lack of predicate facts.

Apart from the invited error, we find no prejudicial violation of Evid.R. 705 in Dr. Knapp's testimony. The jury was ultimately apprised of the specific predicate facts of Dr. Knapp's opinions.

A reviewing court must disregard any "error or defect in the proceeding which does not affect the substantial rights of the parties" and, absent substantial injustice, no error in either the admission or exclusion of evidence is ground for granting a new trial. Civ.R. 61. Apart from the invited error, expert testimony on all aspects of appellees' case was eventually supplemented with an adequate recounting of facts relied upon. MVH has had no substantial right affected by the fact that opinions were received in evidence in some instances before the predicate facts for those opinions were stated by the witness.

Because the opinion testimony on the standard of care and proximate cause was supported by data in the medical record, and by sufficient facts specifically identified by the experts, Drs. Knapp and Ucker, either before or after their testimony on the issues, the trial court erred as a matter of law in granting a new trial based upon a violation of Evid.R. 705.

Appellees further argue that the error in the jury instructions was harmless. We agree.

A charge to the jury must be viewed in its totality, and if the law is clearly and fairly expressed, no reversal will be predicated upon error in a portion of the charge. *Yeager v. Riverside Methodist Hosp.* (1985), 24 Ohio App.3d 54, 24 OBR 107, 493 N.E.2d 559.

The trial court gave detailed instructions to the jury and in so doing mistakenly said "without" in the following passage:

"In this case, in order to establish proximate cause, there must be sufficient showing that with*out* proper diagnosis, treatment, and monitoring of the patient here, that the patient, Renee Wells, would probably have survived." (Emphasis added.)

MVH argued that the misstatement gave a completely opposite meaning than intended, justifying a new trial. We do not dispute the literal meaning of the misstatement; however, we do not agree that this error was prejudicial nor do we find anything unclear or unfair in the charge as a whole.

At trial, although it appears that the defense wanted the trial judge to reread the instruction, neither the parties, the trial court, nor any juror noticed the absurdity that a literal reading of the instruction as given would likely produce. The trial court found only that "the misstated jury instruction may have

contributed to and/or resulted in a potential miscarriage of justice," without indicating where and how this might have occurred. No reasonable juror could have believed that the jury was impaneled to find liability for *proper* medical care. That the jury asked for a definition of "proximate" and received from the court a definition of "proximate means direct" has no bearing on the misstatement. There is no reason to believe that a miscarriage of justice occurred here, and we find that the misstatement was harmless error.

Having found no prejudicial error in any of the technical violations of Evid.R. 705 or in the jury instructions, we must reverse the trial court's decision to grant MVH a new trial.

Appellees' first assignment of error is sustained.

## IV

We construe appellees' second assignment of error to be as follows:

"The trial court erred by granting a directed verdict in favor of defendants Dr. Crino and Miami Valley Hospital."

The trial court ruled on the motion for directed verdict as follows:

"The claims as far as the Court can tell come basically in two categories, the first being relat[ed] to the CVP line that was placed. There is an allegation of negligent placement of the line penetrating the vessel or heart walls into the pericardium, negligent failure to verify the placement of that line by x-ray, and negligent administration of fluid through that line. Then category two, the allegations fall in the area of negligent monitoring, which is basically the failure to diagnose a cardiac tamponade; failure to call for consultation by the resident doctor on duty at that time; and a failure to adequately guide, direct, or supervise the OB resident who was on duty at that time so that person would recognize problems developing with the diseased Renee Wells. * * * Postoperatively, the CVP pressure started upward, started an upward trend, at monitoring between 7:00 and 8:00. At 1:45 a.m. it reached 13, and at 3:00 a.m. it was at 17, and I think it is undisputed at that juncture by Plaintiff's witnesses that probably at that point Renee Wells could not have been saved. The chart also indicates that at midnight Dr. Miller was in to assess the patient, and the patient was under her care at that point onward. At 2:45 a.m. Dr. Crino was notified of the condition of the patient. * * * Miami Valley Hospital is a Defendant in this case as the employer of Drs. Crino and Miller. Dr. Crino is sued in the case as being allegedly co-equally responsible for the placement of the CVP line and as the supervising doctor of Dr. Miller. Dr. Miller is in on a separate allegation, failure to consult. * * * There is no showing that any agency by estoppel has been created so as to keep the hospital from asserting that the acts complained of with

regard to placement of the CVP line were committed by independent contractors, that being, the anesthesiologist, an employer of Dr. Chambers, and also the nurse anesthetist. There is no showing that the Plaintiff was induced to rely on any kind of agency relationship or that the hospital made any representation leading the Plaintiff * * * to believe that the anesthesiologist was operating as an agent under the hospital's authority. Clear application of the Albain doctrine requires then the Court to consider whether or not, of the named Defendants, Dr. Crino under the theory of res ipsa loquitur might be held into the case on those allegations. A res ipsa doctrine is applicable provided all of the defendants in the case are included of those that have exclusive control over the mechanism that is complained of. *Shield [Shields] versus King* [ (1973) ], 40 Ohio App.2d 77 [69 O.O.2d 57, 317 N.E.2d 922], a 1983 case, has never been overruled. * * * In this case * * * the person who have [*sic* ] joint control, that is, Dr. Chambers and his employer and Dr. Crino, are not all before the Court. They are not all Defendants in this case. Had they been, then perhaps the doctrine of res ipsa would have been applicable. As such, then, the Court is going to direct a verdict for the Defendants in respect to all issues pertaining to the placement of the CVP line, that is, the negligent placement of that, and the failure to verify it by x-ray and anything relating to the administration of fluid through that line, although I don't think any of the witnesses made out an allegation that fluid via the CVP line amounted to a deviation of the standard of care. Dr. Crino, correspondingly, will be dismissed as a Defendant in this case. The remaining issues of failure to monitor the deceased and the failure to diagnose a life-threatening condition or the increase of severity of a life-threatening condition, the motions directed to those claims are overruled."

Because Dr. Crino was an employee of MVH during Wells's treatment there, the doctrine of agency by estoppel is inapplicable. Nor is there any *res ipsa loquitur* theory involved in Wells's wrongful death action.

Construing the evidence and record most strongly in favor of appellees, the nonmovants, we conclude that the trial court erred in directing a verdict in favor of Dr. Crino and MVH on the issue of CVP placement.

The trial court acknowledged that appellees were suing Dr. Crino as "being allegedly co-equally responsible for the placement of the CVP line and as the supervising doctor of Dr. Miller." Appellees sufficiently established at trial (1) that Dr. Crino was an employee of MVH, (2) that he was in the operating room during Wells's caesarian, (3) that he had co-responsibility, along with other doctors not parties to this action, for verification of the CVP catheter placement, (4) that he did not verify the CVP placement, (5) that a failure to verify the CVP placement fell below the applicable standards of care for a tertiary care, high-risk setting, (6) that the failure to verify the CVP placement proximately caused

Wells's death, (7) that Wells died of a cardiac tamponade which was inconsistent with preeclampsia but was a recognized complication of CVP catheter placement, and (8) that Wells probably would have survived had the CVP not been filling her pericardium with fluid.

Appellees did not, and evidently could not, show that the CVP line would not have started spilling fluid into the pericardium after a verification x-ray was taken. However, the jury was entitled to consider whether the initial placement of the catheter may have been improper and whether the improper placement was the ultimate beginning of the causal chain of events leading to Wells's death.

Appellees' experts were able to testify that the standard of care was breached and that the breech proximately caused Wells's death. We conclude that the trial court erred in granting a directed verdict for Dr. Crino on the issue of CVP placement verification.

Appellees failed to produce expert testimony on whether Dr. Crino's negligence, on the issue of failure to diagnose, proximately caused Wells's death. Therefore, under *Cooper*, the question of Dr. Crino's liability on the issue of failure to attend could not go to the jury, despite the reasonable inference that Dr. Crino was in a superior position to evaluate Wells and appreciate the significance of another hour's worth of her declining vital signs.

Accordingly, appellees' second assignment of error is affirmed in part and overruled in part.

## V

MVH's sole assignment of error having been overruled, appellees' first assignment of error having been sustained, and appellees' second assignment of error having been sustained in part, we reverse the decision of the trial court granting a new trial, direct the trial court to reinstate the jury verdict, and remand this cause for a trial on the sole issue of Dr. Crino's and MVH's liability for failure to verify the placement of the CVP catheter.

*Judgment accordingly.*

WOLFF and FREDERICK N. YOUNG, JJ., concur.