Ishler et al., Appellees, *v.* Miller, Appellant.

(No. 78-125—Decided December 8, 1978.)

448

*Bradley & Farris Co., L. P. A., Mr. Philip R. Bradley,* *Messrs. Tyack, Scott, Grossman & Wiseman* and *Mr. Thomas M. Tyack,* for appellees.

*Messrs. Lane, Alton & Horst, Mr. Jack R. Alton* and *Mr. Thomas A. Dillon,* for appellant.

*Per Curiam.*

I.

In his first proposition of law, appellant would have this court adopt a discovery rule with respect to the time within which a patient must file his malpractice claim, and hold that where a patient determines in his own mind that malpractice has been committed against him and consults lawyers to prosecute his claim, the statute of limitations begins to run at the time he determines he has a claim, although the physician-patient relationship may continue. See, *e. g., Ehlen* v. *Burrows* (1942), 51 Cal. App. 2d 141, 124 P. 2d 82; Annotation, 80 A. L. R. 2d 368, 383-384, Section 6[c]. Appellant contends that because the evidence reflects that Ishler knew that he had a malpractice claim as early as June 9, 1971, that the statute of limitations should have commenced to run on that date.

This court rejects the view that the discovery rule should apply in the period prior to the termination of the physician-patient relationship.

In *Bowers* v. *Santee* (1919), 99 Ohio St. 361, paragraph two of the syllabus, this court specifically held that the statute of limitations in a medical malpractice action

does not begin to run until the physician-patient relationship is terminated. In that case, we rejected the contention that in the situation involving the negligent treatment of a bone fracture, that the statute of limitations could commence to run at the time of the faulty resetting of the bone and not at the later time when "the contract of employment" between the physician-surgeon and patient had ended.

The reasons for the termination rule were succinctly set forth by this court in *Wyler* v. *Tripi* (1971), 25 Ohio St. 2d 164, at pages 167-168, wherein we stated:

"The justification for the termination rule is that it strengthens the physician-patient relationship. The patient may rely upon the doctor's ability until the relationship is terminated and the physician has the opportunity to give full treatment, including the immediate correction of any errors in judgment on his part. In short, it was thought that the termination rule is conducive to that mutual confidence which is essential to the physician-patient relationship."

Thus, to require a patient to file suit for malpractice during the course of treatment for a particular injury or disease when he believes or reasonably should believe that he has a malpractice claim would destroy this mutual confidence in the physician-patient relationship. Such a requirement would place the patient in the unacceptable situation of deciding whether to continue the ongoing treatment and thus risk the chance of forfeiting his right to bring suit at a later date, or terminate the relationship, and, perhaps, deny the physician the opportunity of correcting his error.

As noted in *Bowers, supra*, at page 366:

"The patient relies almost wholly upon the judgment of the surgeon, and under the usual circumstances of each case is bound so to do, and if the injury is not reduced, and a normal condition restored, as fully or as speedily as expected, the patient is still at liberty to rely upon the professional skill, care and treatment to complete such recovery so long as the surgeon continues his employment with reference to the injury."

In support of his first proposition of law, appellant places great stress on the phrase "at the latest" employed by this court in the *Wyler* syllabus, which reads:

"Under R. C. 2305.11, a cause of action for medical malpractice accrues, at the latest, when the physician-patient relationship finally terminates. * * *"

Appellant contends that the use of this phrase is a recognition by this court that the statute of limitations may begin to run before the termination of the physician-patient relationship.

In discussing the commencement of the running of the statute of limitations in a medical malpractice case, this court first employed the phrase "at the latest" in *DeLong* v. *Campbell* (1952), 157 Ohio St. 22, 26-27, wherein we held that a malpractice claim brought more than one year after the termination of the physician-patient relationship, but within one year of the discovery of the malpractice by the patient, is barred under G. C. 11225, now R. C. 2305.11. Because no issue regarding the possibility of an earlier commencement date for the running of the statute of limitations was present in *DeLong* or in the subsequent cases citing the language of *DeLong* with approval, it is misleading to attach special significance to use of the phrase. Correctly interpreted, the phrase "at the latest" in conjunction with the termination rule is simply a negative response to the question of whether the statute of limitations may commence to run at a date later than that on which the physician-patient relationship ends.

Appellant's first proposition of law is, therefore, overruled.

## II.

In his second proposition of law, appellant contends that because the appellees based their claim against Doctor Miller on the allegedly unnecessary surgery performed on September 21, 1970, that the claim was one of battery, and thus, the statute of limitations started to run on the date of the unnecessary surgery.

The evidence reflects that although appellees initially brought suit alleging the negligent performance of sur-

gery and treatment, their key witness at trial, Doctor Lawrence I. Kaplan, who was brought to establish the negligence of Doctor Miller, only testified concerning his belief that the surgery performed by the doctor on September 21, 1970, was unnecessary at that time.

This court rejects the proposition that the malpractice claim in the instant cause constituted battery.

In *Lundberg* v. *Bay View Hospital* (1963), 175 Ohio St. 133, a patient filed a complaint alleging malpractice against a hospital, which, through its agents, had negligently diagnosed the patient's ailment and had performed unnecessary surgery. Significantly, this court applied the one-year statute of limitations as it would in other medical malpractice cases, by holding:

"It is the established law in Ohio that the one-year statute of limitations as now contained in Section 2305.11, Revised Code, does not begin to run until a medical relationship has finally terminated."

This court, rather than viewing the complaint alleging unnecessary surgery as essentially one of a technical battery and thus holding that the one-year statute of limitations commenced to run on the date of the occurrence of the surgery, in effect regarded the diagnosis and subsequent surgery as part of the overall medical treatment provided by the hospital to relieve the patient's malady. The court therefore applied the termination rule in determining when the statute of limitations commenced to run. The surgeon owes a duty to his patient to exercise that degree of skill, care, and attention as exercised by members of his profession in deciding that surgery is necessary. See *Gillette* v. *Tucker* (1902), 67 Ohio St. 106, paragraphs one and two of the syllabus. It is the violation of this duty which constitutes the gravamen of the complaint based on medical malpractice, and not any unpermitted contact. See *White* v. *Hirschfield* (1925), 108 Okla. 263, 236 P. 406; *Maercklein* v. *Smith* (1954), 129 Colo. 72, 266 P. 2d 1095; *Mayor* v. *Dowsett* (Ore. 1965), 400 P. 2d 234, 251.

In support of his second proposition of law, appellant

cites the case of *Murray* v. *Fox* (1974), 300 Minn. 373, 220 N. W. 2d 356, wherein the Supreme Court of Minnesota held that where the gist of a complaint in malpractice is the performance of unnecessary surgery, the statute of limitations begins to run on the date of the surgery, and not on the date the physician-patient relationship ends.

This court does not find the *Murray* holding persuasive. The essential element which determined the outcome in that case was the fact that the patient, prior to the alleged unnecessary surgery, had received consulting opinions of other doctors recommending that she not undergo surgery. Because Minnesota applies the discovery rule to situations prior to the termination of the physician-patient relationship, it follows that the statute of limitations commenced to run in *Murray* at the time the patient became aware of the facts upon which her claim was ultimately based, the date of the surgery. As has already been noted, Ohio does not apply the discovery rule in the situation where the physician-patient relationship has not ended.

Appellant's second proposition of law is overruled.

### III.

Appellant contends in his third proposition of law that before a person may qualify as a medical witness against a physician in a medical malpractice case, he must be board-certified in the same speciality as the physician.

In the instant cause, appellees introduced the testimony of Doctor Kaplan, a physician specializing in the fields of neurology and psychiatry, to establish their claim that Doctor Miller, an orthopedic surgeon, performed unnecessary surgery. To establish causation between the unnecessary surgery and the resulting permanent damages to Robert Ishler, appellees introduced the testimony of Doctor Watson D. Parker, Jr., a physician specializing in the field of physical medicine and rehabilitation. The trial court, in admitting the above medical testimony, rejected the contention of the defense that only a board-certified orthopedic surgeon could testify against Doctor Miller. We agree.

In *Alexander* v. *Mt. Carmel Medical Center* (1978), 56 Ohio St. 2d 155, this court recognized that where the fields of medicine overlap, a witness from a school or specialty other than that of the defendant physician may qualify as an expert witness if he demonstrates sufficient knowledge of the standards of the defendant's school and specialty enabling him to give an expert opinion as to the conformity of the defendant's conduct to those particular standards.

As noted in *Alexander, supra*, at page 159, the test of admissibility is whether a particular witness offered as an expert will aid the trier of fact in the search of the truth, not whether the expert witness is the best witness on the subject.

In applying the principles of *Alexander* to the cause at bar, the court finds that the trial court exercised proper discretion in admitting the testimonies of Drs. Kaplan and Parker.

Concerning the qualifications of Doctor Kaplan to testify regarding the necessity of Ishler's back surgery, the evidence reflects that Doctor Kaplan has worked in close conjunction with orthopedic surgeons as an attending neurologist at a primarily orthopedic hospital. Doctor Kaplan frequently served as a consultant to orthopedic surgeons attempting to diagnose low back problems. He employed the same diagnostic tools as used by orthopedic surgeons in his work, and demonstrated a knowledge of the standards or procedures generally used by members of the defendant's profession in arriving at a decision to perform back surgery.

Although Doctor Kaplan could not have qualified as an expert witness concerning whether Doctor Miller properly performed surgery, it is clear that the practical experience gained from his consultations with orthopedic surgeons qualified him to testify regarding the suitability of Ishler for surgery. See *Cornfeldt* v. *Tongen* (Minn. 1977), 262 N. W. 2d 684, 693; *Fitzmaurice* v. *Flynn* (1975), 167 Conn. 609, 356 A. 2d 887.

Doctor Parker's educational background and experience likewise reflect his qualifications to testify as an expert witness in this cause. As a physician specializing in physical medicine and rehabilitation, Doctor Parker frequently examined and treated patients who had orthopedic surgery. In January of 1973, Doctor Parker reviewed Ishler's medical history and gave Ishler a medical examination. It is apparent that on the basis of this examination, Doctor Parker was able to render an informed opinion regarding the probable cause of Ishler's physical difficulties.

Therefore, appellant's third proposition of law is overruled.

## IV.

In his fourth proposition of law, appellant contends, in effect, that it was prejudicial error for the trial court to permit Doctor Parker to answer a hypothetical question concerning whether a direct proximate relationship existed between the procedure and treatment rendered Ishler on September 10, 1970 and March 20, 1971, and Ishler's physical difficulties observed by Doctor Parker in 1973. By permitting Doctor Parker to respond that the events were causally related, it is appellant's contention that the trial court improperly admitted in evidence a surgical procedure not at issue in the cause, and improperly confused the jury as to which operation caused the resulting physical difficulties.

The evidence reflects that in September of 1970, Ishler underwent a foraminotomy and that, for approximately three weeks after the operation, he enjoyed a fine postoperative course. However, Ishler again experienced difficulty and in October of 1970, and again in January of 1971, he was hospitalized. Having tried several courses of treatment with no apparent success, Doctor Miller finally performed a low back fusion in March of 1971.

The court finds no prejudicial error which could have occurred in permitting Doctor Parker to respond to a question concerning the causative effects of the two major surgical procedures. The post-operative treatments fol-

lowing the surgery performed on September 21, 1970, were in response to the recurrent poor condition of Ishler three weeks following the first operation. Although the second surgery may have been necessary in correcting the damage resulting from the first operation, any damage flowing from it occurred only because the initial decision to operate was allegedly improper. Therefore, it follows that any adverse causative effects relating to the second operation were part of the damages flowing from the original decision to operate.

Appellant's fourth proposition is, accordingly, overruled.

## V.

Appellant contends in his fifth proposition of law that the jury verdict was against the manifest weight of the evidence since appellees presented no board-certified orthopedic surgeons to prove their cause at trial.

Having already determined that it was within the discretion of the trial court to admit into evidence the testimonies of Drs. Kaplan and Parker, and finding that reasonable minds could reach the judgment rendered on the basis of their testimonies, this court overrules appellant's fifth proposition of law.

## VI.

The final issue confronting this court in the cause at bar is whether it was permissible for the trial court to rule as a matter of law that the physician-patient relationship terminated on March 13, 1972.

The evidence of record reflects that Ishler was originally referred to Doctor Miller by his family physician for treatment of pain centered in his lower back in September of 1970. From September 8, 1970 through May of 1971, Doctor Miller utilized several courses of treatment and two major surgical operations in an attempt to resolve Ishler's physical difficulties. Having little success, Doctor Miller suggested to Ishler that he seek help from Doctor William E. Hunt, a physician specializing in neurosurgery, and wrote a letter to Doctor Hunt for the purpose of setting up

an appointment. In the words of Doctor Miller, "I'd gone as far as I could, and I hoped Dr. Hunt could give him some improvement."

In response to the question concerning whether he continued to "see" Ishler during the period of time that Ishler was in contact with or under the management of Doctor Hunt, the appellant answered in the affirmative. Appellant testified that he "saw" Ishler on the following dates—June 7, 1971, September 2, 1971, October 18, 1971, and March 13, 1972. He testified further that he had prescribed medicine by telephone to Ishler on several occasions during the summer of 1971, and on the following dates—September 30, 1971, October 13, 1971, November 10, 1971, and November 30, 1971.

Concerning the medicines prescribed over the telephone in November of 1971, appellant indicated that these were not prescribed for Ishler as part of an "onging treatment." According to appellant, beginning in September of 1971, the medications he had prescribed for Ishler consisted of Valium, a muscle relaxant, Seconal, and Darvon, a pain medication. Appellant noted further that on July 22, 1971, he had reviewed Ishler's EMG and had spoken to Ishler on the telephone.

As to the events surrounding the last office visit made by Ishler with Doctor Miller on March 13, 1972, Ishler testified that his main reason for seeing the doctor was to "* * * [h]ave another examination and to have him fill out the Social Security papers."

Doctor Miller testified that he did examine Ishler on March 13, 1972, completed the necessary reports to be submitted to the United States Department of Health, Education, and Welfare, and "* * * advised him to continue with the type of symptomatic treatment he had been following * * *." (This treatment included the taking of certain prescribed medicines.) Although stating that Ishler's March visit was not the result of a request for a continuing course of treatment, Doctor Miller, in describing his reasons for giving Ishler an appointment, testified. "Well, Mr. Ishler.

was having trouble and I felt sorry for him. I thought he needed my help and I wanted to give it to him."

Our review of the record compels this court to uphold the ruling of the trial court which granted appellees' motion to have the issue concerning the termination date of the physician-patient relationship taken from the jury.

In *Millbaugh* v. *Gilmore* (1972), 30 Ohio St. 2d 319, this court confronted the issue of whether the physician-patient relationship continued in the situation where a patient, who had missed a scheduled appointment with his doctor, continued to take medicine prescribed by the doctor without the doctor's knowledge for a full year after the missed appointment. In holding that the physician-patient relationship did not continue beyond the date of the missed appointment, this court noted that the taking of prescribed medicine in such an unsupervised manner could not have constituted a continuing course of treatment. *Millbaugh, supra,* at pages 321-322. We noted further that, being unaware of the patient's continued use of the prescribed medicines, the physician was afforded no opportunity to provide full treatment or correct any errors of judgment on his part. *Millbaugh, supra,* at page 322. Thus, the purposes of the termination rule as set forth in *Bowers, supra,* at pages 365-366, and 368, and *Wyler, supra,* at pages 167, 168, would not have been served by holding that the physician-patient relationship continued in such a situation. However, had the patient in *Millbaugh* taken the prescribed medicine with the knowledge of the physician and under his supervision, it is clear that this court would have found that the physician-patient relationsip continued beyond the date of the missed appointment.

In the instant cause, although Doctor Miller referred Ishler to a neuro-surgeon for further treatment in May of 1971, it is uncontroverted that Doctor Miller continued to see Ishler on occasion and to prescribe medication for the relief of Ishler's back pain through November of 1971. These actions on the part of Doctor Miller overwhelmingly

indicate that Ishler remained under the supervision of Doctor Miller for part of his care. Thus, unlike the situation in *Millbaugh,* Doctor Miller was afforded the opportunity of providing additional treatment. Clearly, the physician-patient relationship continued at least through November of 1971 and thus, appellees' complaint, filed on November 1, 1972, came well within the one-year statute of limitations.

Since the trial court properly ruled as a matter of law that appellees brought their malpractice action within the one-year statute of limitations, the judgment of the Court of Appeals with respect to this issue is reversed. The judgment of the Court of Appeals with respect to the other issues herein is affirmed.

*Judgment affirmed in part and reversed in part.*

CELEBREZZE, W. BROWN, SWEENEY and LOCHER, JJ., concur.

LEACH, C. J., and HERBERT, J., dissent.

HERBERT, J., dissenting. I dissent because I believe that our former cases should be modified to simplify the test for commencement of the running of the statute of limitations by deleting the phrase "at the latest," and because, upon the state of this record, I believe that the question of the termination of the physician-patient relationship should have been submitted to the jury.