OPINION
{¶ 1} Defendant-appellant, Brian Fleming, appeals his convictions in the Butler County Court of Common Pleas on two counts of vehicular assault, one count of leaving the scene of an accident, and one count of reckless operation. We affirm the decision of the trial court.
 {¶ 2} On August 14, 2001, 17-year-old Kimberly Pizzo drove her Chevrolet Cavalier to Oxford, Ohio, in order to pick up her boyfriend, 16-year-old Michael Jarrells. Kimberly got lost while in Oxford so she stopped at a United Dairy Farmers' store ("UDF") to ask for directions.
 {¶ 3} Kimberly approached 45-year-old appellant and asked him for directions, however, he was unable to assist her. Kimberly then exited the UDF. Appellant was in the UDF with his nephew, Wayne Galliher, and their friend, Drew McCoy.
 {¶ 4} Once outside the UDF, Kimberly saw Michael walking toward her. Appellant, Drew, and Galliher exited the UDF and began making sexual comments to Kimberly. Michael overheard the comments and approached appellant, asking "what he said." Appellant denies making any comments to Kimberly. Appellant maintains Michael asked him why he was flirting with Kimberly and began an altercation.
 {¶ 5} An argument between appellant and Michael began. Appellant grabbed Michael by the throat and then lifted him "off the ground." Kimberly and Galliher stepped in between Michael and appellant to separate them. Appellant then told Kimberly, "I can break your boyfriend's nose."
 {¶ 6} Appellant denies making the comments and testified that he was only defending himself against 16-year-old Michael. Appellant testified that he was a Marine Corps security guard and that he holds a first-degree black belt in Tae Kwon Do.
 {¶ 7} Once separated, Michael entered Kimberly's vehicle. One of her passengers, Billy Anderson, threw an empty plastic pop bottle at appellant's vehicle, a Lincoln. Appellant then stated, "I'll kill you," and "[w]e are going to finish this." Kimberly became frightened and pulled away in her vehicle.
 {¶ 8} Appellant denies making the statements, however, he did pull his Lincoln out of the UDF parking lot and follow Kimberly's vehicle. When Kimberly would stop her vehicle, appellant would attempt to pass Kimberly and stop his vehicle so she could not evade him. Appellant maintains he was attempting to get Kimberly's license plate number to obtain reimbursement for damage caused when the empty plastic pop bottle thrown by Anderson struck his vehicle.
 {¶ 9} Scott Teleford was driving on State Route 177. Kimberly turned onto State Route 177 directly behind Teleford. Appellant pursued Kimberly onto State Route 177. Appellant passed several cars, got several car lengths in front of Kimberly, and then partially blocked the northbound lane with his vehicle. Galliher exited appellant's Lincoln and approached Kimberly's vehicle. Kimberly attempted to pass appellant's Lincoln, but as her vehicle moved past appellant's Lincoln, he pulled his car forward into her lane and rammed her car.
 {¶ 10} The impact immobilized Kimberly's vehicle causing damage to the tire and the "tire iron." The damaged wheel caused a post-impact mark on the roadway that began left of the centerline where the impact had occurred. The mark curved down, showing the Cavalier's final resting point.
 {¶ 11} Appellant then appeared to be leaving the scene of the collision, so Michael got in front of appellant's vehicle to keep him from driving off. Michael kicked the front bumper of appellant's Lincoln. Appellant accelerated and ran into Michael. Michael fell onto the hood of appellant's vehicle, then onto the ground. Appellant then left the scene of the accident. Michael was unable to walk so Kimberly pulled him to the roadside.
 {¶ 12} The clerk at the UDF in Oxford obtained appellant's license plate number. Appellant was charged with two counts of vehicular assault, leaving the scene of an accident, assault, aggravated menacing, and reckless operation. A jury convicted appellant of two counts of vehicular assault, leaving the scene of an accident, and reckless operation. Appellant appeals the convictions raising three assignments of error.
 Assignment of Error No. 1 {¶ 13} "The court erred when it allowed an alleged expert witness to testify contrary to evidence rules 702, 703, and 705 and over the defendant's continuing objection."
 {¶ 14} Appellant argues the trial court erred by allowing Deputy Sheriff James E. Mueller to testify as an expert without having been properly qualified as required under Evid.R. 702.
 {¶ 15} The trial court is vested with broad discretion in its determination of the competency of an expert witness, and the court's ruling on the issue will not be reversed absent an abuse of that discretion. Scott v. Yates, 71 Ohio St.3d 219, 221, 1994-Ohio-462. An abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the court that is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 16} Evid.R. 702 provides:
 {¶ 17} "A witness may testify as an expert if all of the following apply:
 {¶ 18} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 19} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 20} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *."
 {¶ 21} The qualification of an expert depends upon the expert's possession of special knowledge that he or she has acquired either by study of recognized authorities on the subject or by practical experience that he or she can impart to the trier of fact. Ishler v. Miller (1978),56 Ohio St.2d 447, 453-454; Evid.R. 702.
 {¶ 22} The evidence presented at trial established that Deputy Mueller is employed with the Butler County Sheriff's Office and is assigned to accident investigation. Deputy Mueller testified that he had extensive education and training in accident investigation. Deputy Mueller stated that he had "investigated several hundred accidents," and that he had "been through accident investigation [classes] levels one, two, and three held here in Butler County." He testified that he has "also been through accident reconstruction school through the University of North Florida, which was held at Indianapolis Police Academy in Indianapolis, Indiana."
 {¶ 23} Under Evid.R. 702(B), Deputy Mueller is qualified by specialized knowledge, skill, experience, training, and education to testify as an expert on the subject matter of auto accident investigation and accident reconstruction. See State v. Rhodes, Lake App. No. 2000-L-089, 2001-Ohio-8693. We hold that the trial court's decision finding Deputy Mueller properly qualified to testify as an expert was not unreasonable, arbitrary, or unconscionable.
 {¶ 24} Appellant also argues that Deputy Mueller's "testimony used a `procedure' not supported by Evid.R. 702(C)" and that the "procedure" he used was not identified in the plaintiff's response to discovery.
 {¶ 25} Evid.R. 702(C)(3), requires an expert opinion founded on a test to also show that "[t]he particular procedure, test or experiment was conducted in a way that will yield an accurate result." However, InState v. Stowers, 81 Ohio St.3d 260, 261, 1998-Ohio-632, the Ohio Supreme Court ruled that if an expert's testimony is based on "specialized information" that "does not involve scientific or technical testing or procedures," then "the further requirements listed in Evid.R. 702(C)(1) to (3) are not at issue."
 {¶ 26} Deputy Mueller testified that he based his opinion on his observations "of the tire marks in the roadway," his observations "of the victim's vehicle," and his observations of the "defendant's vehicle." Deputy Mueller testified that he could not conduct any procedure, test, or experiment because "at the scene of the accident, measurements were not taken by the responding officers. I did not have the final rest of the vehicles or the rest of the technical evidence that I need to do a full reconstruction."
 {¶ 27} As Deputy Mueller's expert opinion was not based on a "procedure" and did not involve scientific or technical testing or procedures, the requirements listed in Evid.R. 702(C)(3) are not at issue. Furthermore, since Deputy Mueller's expert opinion was not based on a "procedure," there was no need to identify a procedure in the plaintiff's response to discovery.
 {¶ 28} Appellant argues that Deputy Mueller was allowed to give testimony based upon data collected from an accident scene visited ten to 12 days after the collision. Appellant maintains the "stale evidence" should have been excluded.
 {¶ 29} Deputy Mueller testified that he based his opinion, in part, upon photos of the post-impact mark that had been taken within 24 hours of the automobile collision. Deputy Mueller then personally viewed the post-impact mark at the scene ten to 12 days after the collision. This testimony was in accordance with Evid.R. 703 which permits an expert to testify as to an opinion or inference based, in whole or in major part, upon facts or data perceived by him.
 {¶ 30} Appellant argues that Deputy Mueller gave his opinion without ever disclosing the "underlying facts or data." Evid.R. 705 covers the disclosures of facts or data underlying an expert opinion. The rule states, in relevant part: "[t]he expert may testify in terms of opinions or inferences and give his reasons therefore after disclosure of the underlying facts or data." Deputy Mueller testified that his opinion was based upon photos of the post-impact mark, his observations of the tire marks in the roadway, his observations of the victim's vehicle, and his observations of the defendant's vehicle. Deputy Mueller disclosed the underlying facts and data upon which his opinions and inferences were based. Therefore, Evid.R. 705 was satisfied. The first assignment of error is overruled.
 Assignment of Error No. 2 {¶ 31} "The court, after sustaining the defendant's objection, allowed the victim to testify about matters that were told to him, i.e., I was told my brain was bleeding, and failed to strike the comments and allowed the state to again solicit hearsay testimony, thus committing plain error."
 {¶ 32} Appellant argues that Michael improperly introduced hearsay evidence of his medical diagnosis without personal knowledge. Michael was asked about his condition after the auto collision. Michael testified, "[t]hey said my brain was bleeding." Defense counsel objected to the answer and the objection was sustained. However, Michael gave the same reply to a subsequent question.
 {¶ 33} Although victims have personal knowledge of their medical diagnoses, they may not testify to those facts. Holt v. Olmsted Tp. Bd.of Trustees (N.D.Ohio, 1998), 43 F. Supp.2d 812, 819. The diagnoses of doctors may only be established through admission of the relevant doctors' records or the sworn testimony of these doctors. Id.
 {¶ 34} However, the admission of hearsay may be harmless if it does not affect the defendant's substantial rights. Crim.R. 52(B). Deputy Thomas Lentz, of the Butler County Sheriff's Office, responded to the scene of the accident. He testified that Michael "had obtained a head injury from the crash." Scott Teleford, a witness to the accident, testified that, the Lincoln automobile "accelerated and hit this young man, knocked him to the ground. I thought he was probably dead." Linda Jarrells, Michael's mother, testified that when she arrived at the Miami Valley hospital, Michael was "in the trauma center." She testified that he was "in a cervical collar," and he "was very confused * * * he was very upset that he couldn't tell us how old he was." Linda testified that Michael was "moved to ICU" and he "was three days in intensive care."
 {¶ 35} The admission of Michael's hearsay testimony as to his "bleeding brain" was harmless error, as it did not affect the defendant's substantial rights because evidence of Michael's "head injury" was offered into evidence through other means. Consequently, the second assignment of error is overruled.
 Assignment of Error No. 3 {¶ 36} "The trial court erred when it allowed the state to impeach its own witness by claiming the witness was hostile when the defense objected to leading questions."
 {¶ 37} Appellant argues that Evid.R. 607 requires the state to show "surprise" and "affirmative damage" before being allowed to ask its own witness leading questions. Appellant maintains that the state only claimed its witness was hostile. Therefore, appellant argues that the court erred when it allowed the state to ask leading questions.
 {¶ 38} However, the state observes that Evid.R. 611(C) authorizes the use of leading questions when a party calls a hostile witness. Evid.R. 611(C) does not contain the "surprise and affirmative damage" requirement. The state argues, therefore, that the trial court's determination to allow leading questions was proper.
 {¶ 39} Allowing or refusing "leading questions in the examination of a witness must very largely be subject to the control of the court, in the exercise of a sound discretion." Ramage v. Central Ohio EmergencyServ., Inc., 64 Ohio St.3d 97, 1992-Ohio-109, paragraph six of the syllabus. In the "absence of an abuse of discretion, the trial court's ruling must stand" Id. Evidence of a long-term relationship between a witness and the defendant or another reason for a strong affinity between a witness and defendant may be a sufficient basis for a court to allow the state to ask leading questions of a witness on direct examination. See State v. Dolce (1993), 92 Ohio App.3d 687, 703; State v. Stearns
(1982), 7 Ohio App.3d 11, 14.
 {¶ 40} Evidence shows that Wayne Galliher was an occupant of appellant's Lincoln during the car chase and is appellant's nephew. On direct examination, the state asked Galliher "what did you tell your uncle when you were in the car?" Galliher was evasive when answering the question. Galliher testified that he "didn't believe" that he said anything. The state offered Galliher the statement he gave to police the night of the accident to refresh his memory. When Galliher was still evasive, the state asked for permission to treat Galliher as a hostile witness. The court gave the state permission to ask a single leading question. The state then asked Galliher, "Did you tell your uncle, don't kill anybody?"
 {¶ 41} There was sufficient evidence of a long-term relationship between Galliher and the defendant as a basis for the court to allow the state to ask a leading question of the witness on direct examination. The trial court's decision was not unreasonable, arbitrary, or unconscionable. The third assignment of error is overruled.
Judgment affirmed.
Valen, P.J., and Young, J., concur.