OPINION
{¶ 1} Arlene Shade, as administrator of the estate of William Shade, appeals from a judgment of the Montgomery County Court of Common Pleas, which granted summary judgment to Dr. Scott Bleser ("Dr. Bleser") and Bellbrook Medical Center ("Bellbrook"), Dr. Bleser's professional corporation, on her survivorship medical malpractice claim. The court held that the action was not brought within the one-year statute of limitations.
 {¶ 1} On April 20, 2001, William Shade underwent an ultrasound at the office of Dr. Scott Bleser. Upon examination, Dr. Bleser noticed a deep vein thrombosis in his left leg and instructed Mr. Shade to go to Miami Valley Hospital ("MVH") for treatment. That day, Mr. Shade was admitted to Miami Valley Hospital where he received anticoagulation therapy. Mr. Shade was discharged to his home on April 23, 2001. His discharge instructions stated that he was to receive daily monitoring of his anticoagulation therapy and physical therapy. Fidelity Health Care was retained to perform the home monitoring and blood testing; Mr. Shade was also to continue care with Dr. Bleser. On April 29 and 30, Mr. Shade was not monitored, tested, or visited. On April 30, 2001, he was re-admitted to the hospital due to hemorrhaging. He remained at MVH until July 10, 2001, when he was transferred to the Veterans Administration Medical Center. Mr. Shade died on July 16, 2001.
 {¶ 2} On January 8, 2003, Arlene Shade, individually and as administrator of her husband's estate, brought suit against Dr. Bleser, Bellbrook, MVH, South Dayton Acute Care Consultants, Inc. ("South Dayton"), Fidelity Health Care, Inc. ("Fidelity"), Dr. Stephen Lucht ("Dr. Lucht"), and Dr. Wendy Schmitz ("Dr. Schmitz"), alleging medical negligence and loss of consortium. With regard to Dr. Bleser, Mrs. Shade alleged that the physician had failed to properly monitor her husband between April 24, 2001, and April 30, 2001. MVH, South Dayton, Dr. Lucht and Dr. Schmitz were subsequently voluntarily dismissed from the litigation.
 {¶ 3} On March 8, 2004, Dr. Bleser and Bellbrook filed a motion for partial summary judgment, arguing that Mrs. Shade's claims were filed after the expiration of the statute of limitations. They asserted that the statute of limitations began to run on April 30, 2001, when Mr. Shade began to experience hemorrhaging. Dr. Bleser asserted that the termination of the physician-patient relationship occurred on April 30, 2001, as well. Dr. Bleser and Bellbrook also claimed that Mrs. Shade's suit was untimely, because she had failed to notify them of her intent to sue prior to the expiration of the limitations period and, consequently, she could not avail herself of the 180-day extension provided by R.C. 2305.11(B)(1).
 {¶ 4} On October 6, 2004, the trial court granted Dr. Bleser's and Bellbrook's motion as to the survivorship claim. The court noted that Mrs. Shade had not disputed that the cognizable event occurred on April 30, 2001, and it found that the termination rule did not extend the accrual date, because there was no evidence that "the patient had any future scheduled appointments with Defendant Bleser and no evidence Defendant Bleser continued to provide care, advice, medication or treatment." The court thus held that, because Mrs. Shade did not file suit or provide Dr. Bleser or Bellbrook with a notice of intent by April 30, 2002, i.e., one-year from the cognizable event, the survivorship claim was untimely. The court indicated that Mrs. Shade's loss of consortium claim had been timely filed.
 {¶ 5} On November 8, 2004, Mrs. Shade filed a notice of appeal regarding the October 6, 2004, order. This appeal was dismissed for lack of a final appealable order. In January 2005, Mrs. Shade voluntarily dismissed Fidelity as a defendant and all claims other than the survivorship claim against Dr. Bleser and Bellbrook, thereby transforming the prior partial summary judgment order into a final appealable order. Mrs. Shade filed a second notice of appeal on February 28, 2005.
 {¶ 6} Mrs. Shade raises one assignment of error.
 {¶ 7} "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS-APPELLEES BECAUSE THE OCCURRENCE OF A COGNIZABLE EVENT AND THE DETERMINATION AS TO WHEN THE PHYSICIANP-ATIENT RELATIONSHIP TERMINATES ARE QUESTIONS OF FACT APPROPRIATE FOR THE JURY."
 {¶ 8} Mrs. Shade claims that the trial court erred in concluding, as a matter of law, that her medical negligence claim was untimely filed. She asserts that a genuine issue of material fact existed as to whether her husband remained Dr. Bleser's patient until his death on July 16, 2001, and, thus, the trial court erred in concluding that the cause of action accrued on April 30, 2001. Mrs. Shade further asserts, in her reply memorandum, that she gave timely notice to both Dr. Bleser and Bellbrook of her intent to sue.
 {¶ 9} At the time of the events at issue, the statute of limitations for medical malpractice actions was set forth in R.C.2305.11 (now R.C. 2305.113), which provided that "an action upon a medical * * * claim shall be commenced within one year after the cause of action accrues." If prior to the expiration of the one-year period a claimant who allegedly possesses a medical malpractice claim gives written notice to the person who is the subject of that claim that the claimant is considering bringing a malpractice action, that action may be commenced against the person notified at any time within one hundred eighty days after the notice is given. Id.
 {¶ 10} A cause of action for medical malpractice accrues upon the later of either (1) the termination of the physician-patient relationship for that condition, or (2) when the patient discovers or, in the exercise of reasonable care and diligence should have discovered, the resulting injury. Frysinger v.Leech (1987), 32 Ohio St.3d 38, 512 N.E.2d 337.
 {¶ 11} Under the discovery rule, the statute of limitations begins to run when there is a "cognizable event" whereby a reasonable patient is alerted or should have been alerted that an improper medical procedure, treatment or diagnosis has taken place. Akers v. Alonzo, 65 Ohio St.3d 422, 425, 1992-Ohio-66,605 N.E.2d 1, citing Allenius v. Thomas (1989),42 Ohio St.3d 131, 134, 538 N.E.2d 93. "Once the cognizable event occurs, the plaintiff must (1) determine whether the injury suffered is the proximate result of malpractice and (2) ascertain the identity of the tortfeasor or tortfeasors. Flowers v. Walker (1992),63 Ohio St.3d 546, 589 N.E.2d 1284, syllabus. Thus, once a patient becomes aware of an injury, it is incumbent upon that individual to investigate his or her case completely." Simonds v. Kearney,
Wayne App. No. 01CA35, 2002-Ohio-761.
 {¶ 12} Under the termination rule, a medical malpractice cause of action does not accrue until the physician-patient relationship for the condition at issue has ended. The supreme court has repeatedly stated that "[t]he justification for the termination rule is that it strengthens the physician-patient relationship. The patient may rely upon the doctor's ability until the relationship is terminated and the physician has the opportunity to give full treatment, including the immediate correction of any errors in judgment on his part. In short, it was thought that the termination rule is conducive to that mutual confidence which is essential to the physician-patient relationship. To require a patient to file suit for malpractice during the course of treatment * * * would destroy this mutual confidence * * * [and] place the patient in the unacceptable situation of deciding whether to continue the ongoing treatment and thus risk the chance of forfeiting his right to bring suit at a later date, or terminate the relationship, and, perhaps, deny the physician the opportunity of correcting his error."Frysinger, 32 Ohio St.3d at 41; Ishler v. Miller (1978),56 Ohio St.2d 447, 449, 384 N.E.2d 296; Wyler v. Tripi (1971),25 Ohio St.2d 164, 167-168, 267 N.E.2d 419. Thus, the termination rule "may operate to extend the time of accrual of the cause of action beyond the `cognizable event,' when the professional relationship for the condition remains active." Kiser v. Rubin
(Sept. 8, 1995), Montgomery App. No. 15254.
 {¶ 13} "Either party to the physician-patient relationship may terminate the relationship if the terminating party takes affirmative steps to do so. The patient may terminate by refusing further treatment, or in the absence of unequivocal action, by failing to keep the next scheduled appointment. The doctor may end the relationship, but must afford the patient reasonable notice of the termination." Kiser, supra (citations omitted).
 {¶ 14} In the present case, Mrs. Shade does not rely upon the discovery rule. Rather, she asserts that the statute of limitations began to run when the physician-patient relationship between her husband and Dr. Bleser terminated due to her husband's death on July 16, 2001. Dr. Bleser asserts that the termination rule is not applicable, because Mr. Shade "was not placed in the `unacceptable situation' of deciding whether to continue ongoing treatment with Dr. Bleser or terminate the physician-patient relationship." Alternatively, Dr. Bleser asserts that his relationship with Mr. Shade terminated on April 30, 2001, when he ceased to be involved in his care. He relies primarily upon Ishler, supra, and Watkins v. Lyle (Oct. 20, 1981), Montgomery App. No. 7209.
 {¶ 15} In our judgment, there was a genuine issue of material fact as to whether the physician-patient relationship for Mr. Shade's condition terminated on July 16, 2001. According to Dr. Bleser's affidavit, he provided general medical care to Mr. Shade from December 8, 1993, through April 30, 2001. He stated that, while under his care for follow-up deep vein thrombosis treatment, Mr. Shade was admitted to the hospital due to coughing-up blood and blood in his stool. Although Dr. Bleser indicated that he did not have contact with Mr. Shade nor render care to him after April 30, 2001 (i.e., following his readmission to the hospital), he testified in his deposition that he normally would not render direct care while a patient was hospitalized. As noted by Mrs. Shade, Dr. Bleser testified:
 {¶ 16} Q: "Is there any reason why you as the family physician weren't involved in Mr. Shade's hospital care?"
 {¶ 17} A: "Yes. I — I am a solo practitioner. I don't have that many admissions — inpatient admissions per year so I think it's in my patient's best interest to have somebody that's in the hospital — in fact that group I believe covers the hospital 24 hours a day. One of them is always present."
 {¶ 18} Q: "Is it the kind of thing — and I just don't understand necessarily the relationship if there is one — is it the kind of thing where you would send your patient to that group for treatment in the hospital and they would report back to you?"
 {¶ 19} A: "Yes."
 {¶ 20} Here, Dr. Bleser acknowledges that he provided follow-up care for Mr. Shade upon his initial discharge from the hospital on April 23, 2001. Dr. Bleser took no actions to terminate his physician relationship with Mr. Shade upon his readmission to MVH, nor did Mr. Shade take any steps to terminate that relationship. Mrs. Shade stated in her deposition that Dr. Bleser was her husband's physician until his death. Based on the record, it could be reasonably inferred that Dr. Bleser's failure to provide additional follow-up medical care was simply a consequence of Mr. Shade's death during his hospitalization, and it was not due to a termination of the physician-patient relationship. This inference is buttressed by the fact that Dr. Bleser's office sent Mr. Shade correspondence after his death about participating in an insulin study. Based on Dr. Bleser's testimony, it would be reasonable to conclude that he would have provided additional follow-up care had Mr. Shade ultimately been discharged.
 {¶ 21} We disagree with Dr. Bleser and Bellbrook thatIshler and Watkins compel a different result. In Ishler,
the plaintiff had been referred to Dr. Miller, an orthopedic surgeon, by his family physician due to back pain. The supreme court rejected Dr. Miller's contention that the physician-patient relationship ended when Dr. Miller subsequently referred the plaintiff to a neurosurgeon. While the plaintiff was being treated by the neurosurgeon, Dr. Miller saw the plaintiff on several occasions and prescribed medication by telephone at various times. The plaintiff's last visit to Dr. Miller occurred on March 13, 1972, for the purpose of a medical examination and for Dr. Miller to complete Social Security papers. The supreme court held that "[c]learly, the physician-patient relationship continued at least through November of 1971 and thus, [Ishler's] complaint, filed on November 1, 1972, came well within the one-year statute of limitations." Ishler, 56 Ohio St.2d at 458.
 {¶ 22} In Watkins, the plaintiff underwent radiation therapy with the defendant, Dr. Lyle, following resection of a cancerous tumor. The treatment occurred from January 1976 to February 1976, and Watkins had various follow-up visits through May 1978. In reviewing when the physician-patient relationship ended, we stated that "termination occurs upon the cessation of physician supervised or authorized care relative to the alleged negligent act or omission." Turning to the facts before us, we concluded that, because Dr. Lyle did not provide post-operative care beyond May 11, 1978, Watkins's cause of action accrued on that date.
 {¶ 23} Unlike Ishler and Watkins, in which the physicians provided specialized medical care to treat a particular condition, Dr. Bleser was Mr. Shade's family doctor, and he provided "general medical care" to Mr. Shade. Although Dr. Bleser referred Mr. Shade to the hospital for treatment of his thrombosis, he indicated that the hospital would report back to him and, as indicated by his provision of care between April 23 and April 30, 2001, that he would provide post-discharge follow-up care. We find this situation factually distinguishable from Ishler and Watkins and, thus, we find those cases to be unpersuasive. Accordingly, we conclude that the trial court erred in concluding, as a matter of law, that Mrs. Shade's cause of action accrued on April 30, 2001, rather than July 16, 2001.
 {¶ 24} Because Mrs. Shade's action was filed on January 8, 2003, i.e., more than one year after the anniversary of Mr. Shade's death, the action is timely only if Mrs. Shade sent a 180-day notice letter to the defendants prior to the expiration of the statute of limitations and if the action was filed within 180 days of the provision of that notice. See R.C.2305.113(B)(1).
 {¶ 25} In Edens v. Barberton Area Family Practice Ctr.
(1989), 43 Ohio St.3d 176, 539 N.E.2d 1124, the Supreme Court of Ohio addressed when the 180-day notice period began to run under R.C. 2305.11. The court held that "where a statute such as R.C.2305.11(B) is silent as to how notice is to be effectuated, written notice will be deemed to have been given when received. Therefore, under R.C. 2305.11(B), the one-hundred-eighty-day period commences to run from the date the notice is received and not the date it is mailed." Id. at 180; see also Marshall v.Ortega, 87 Ohio St.3d 522, 525, 2000-Ohio-481, 721 N.E.2d 1033.
 {¶ 26} According to the record, Mrs. Shade's counsel mailed 180-day notices via certified mail and regular mail to Dr. Bleser, Bellbrook, MVH, South Dayton, Fidelity, Dr. Lucht, and Dr. Schmitz. The notices were mailed on July 12, 2002, four days before the one-year anniversary of Mr. Shade's death. Dr. Bleser's notices were sent to 4336 State Route 725, Bellbrook, Ohio, 45305, the business address that he had provided during his deposition. Bellbrook's notices were sent to its statutory agent, Dr. Bleser, at 10396 Blackbirch Drive, Centerville, Ohio 45458. The address for Bellbrook's notices, which was also Dr. Bleser's home address, was obtained from the Ohio Secretary of State's web page.
 {¶ 27} None of the letters were returned as undeliverable. Certified mail receipts for Fidelity, South Dayton and Dr. Lucht were signed on July 15, 2002. Receipts for Dr. Schmitz and MVH were signed on July 16, 2002. The certified mail receipt for the Bellbrook 180-day notice was signed by Dr. Bleser on July 18, 2002. Thus, Bellbrook's certified letter was signed for two days after the latest possible date that the statute of limitations expired. Dr. Bleser indicated that he was out of town on a family vacation in July 2002, and that he did not receive mail for the period of July 6 through July 14, 2002, until July 18, 2002. The record does not contain a return receipt for the certified letter to Dr. Bleser. Dr. Bleser has denied receiving any letter from Mrs. Shade of her intent to sue him individually.
 {¶ 28} In Dudukovich v. Lorain Metro. Housing Auth. (1979),58 Ohio St.2d 202, 389 N.E.2d 1113, the Supreme Court of Ohio applied a presumption of timely delivery when an administrative agency admittedly had received an employee's notice of appeal but there was no evidence as to when it had been received. There being no evidence of late delivery, the court stated that the presumption of timely delivery controlled. In its reasoning, the court adopted the Third District's reasoning in Young v. Bd. ofReview (1967), 9 Ohio App.2d 25, 222 N.E.2d 789, which stated:
 {¶ 29} "The addressee of mail matter is presumed to have received it as soon as it could have been transmitted to him in the ordinary or regular course of the mails, or as it is otherwise expressed, in due course of the mails. The presumption is not easily overcome, and is reinforced where the envelope in question was actually received in the mails. * * *
 {¶ 30} "Receipt at a particular time cannot ordinarily be presumed unless there is proof of the course of the mails, or the probable time necessary for transmission, as well as of the date of mailing, except where such facts may be judicially noticed[.] * * *." Van Leur v. Ohio Dept. of Commerce, Montgomery App. No. 20180, 2004-Ohio-3777 (quoting Young v. Bd. of Review (1967),9 Ohio App.2d 25, 222 N.E.2d 789).
 {¶ 31} In the present case, Mrs. Shade's counsel indicated that she had mailed the 180-day notice letters on Friday, July 12, 2002, via certified mail and United States first class regular mail. The letters sent via United States first class mail were mailed from 50 West Broad Street in Columbus, Ohio, no later than 4:30 p.m. in accordance with office policy. Mrs. Shade further provided the affidavit of Mark Halsey, a twenty-year employee of the United States Postal Service. Mr. Halsey stated that, on Monday through Friday, mail is collected from 30 West Broad Street at 1:35 p.m., 3:25 p.m., and 5:25 p.m., and that it is the custom of the United States Postal Service to process mail for delivery on the same day that it is collected from the mailboxes. He indicated that mail to be delivered within a 100 mile radius from Columbus, Ohio, customarily takes no more than three business days after the date of mailing. He concluded that a letter mailed first class on July 12, 2002, prior to the last scheduled collection time, and intended for Dayton, Ohio, and the surrounding areas (including Centerville and Bellbrook, Ohio) would be delivered no later than July 16, 2002. Accordingly, Mrs. Shade has presented evidence to support a presumption that Bellbrook and Dr. Bleser received the unreturned 180-day notice letters on July 16, 2002.
 {¶ 32} Citing Bell v. Mittleman (Nov. 12, 1998), Cuyahoga App. No. 73350, Dr. Bleser and Bellbrook assert that the written notice was untimely, because the certified mail receipt for the 180-day notice letter was not signed until July 18, 2002, two days after the expiration of the latest possible date for the statute of limitations. In Bell, the plaintiff argued that she had sent the 180-day notice letter by certified mail and regular mail on November 24, 1995, four days prior to the expiration of the statute of limitations. The defendant indicated that he had received the regular mail notice, but he did not recall the date; the defendant received the certified mail notice on December 1, 1995, three days after the statute of limitations had expired. The court held that the plaintiff had not established that her action was timely filed. It reasoned that the defendant had brought forth evidence that the 180-day notice had not been received in a timely manner, as demonstrated by the certified mail receipt. The court further stated that the burden then shifted to Bell to go forward with evidence that the statute of limitations had been extended by Mittleman's receipt of her 180-day notice prior to November 28, 1995. Because there was no evidence to this effect, the plaintiff's claim was untimely.
 {¶ 33} We find Bell to be distinguishable. Although Bellbrook has presented evidence, in the form of the certified mail receipt, that it did not receive timely notice, Mrs. Shade — unlike the plaintiff in Bell — provided evidence to support the application of the presumption of timely delivery with regard to, at least, the first class regular mail letter. As stated, supra, Mrs. Shade presented evidence that first class mail from Columbus to Dayton, sent on July 12, 2002, would customarily arrive no later than July 16, 2002. Moreover, the receipts for the certified letters to Fidelity, South Dayton, Dr. Lucht, Dr. Schmitz, and MVH — which were also sent on July 12, 2002 — all were signed no later than July 16, 2002. Dr. Bleser, the statutory agent for Bellbrook, indicated that he was out of town on vacation between July 6 and July 14, 2002, and he did not receive his mail for that period until July 18, 2002. Although Dr. Bleser apparently was not aware of the letter until July 18, 2002, his statement does not refute the probability that, at least, the first class regular mail letter was timely delivered to Bellbrook at his address. Accordingly, Mrs. Shade presented sufficient evidence to support the presumption that Bellbrook received the 180-day notice letter within the statute of limitations period.
 {¶ 34} Dr. Bleser asserts that he never received any 180-day notice letter from Mrs. Shade. Thus, Mrs. Shade's suit against Dr. Bleser is timely only if she can avail herself of both a presumption of due receipt and a presumption of timely delivery.
 {¶ 35} In Blackburn Security, Inc. v. Ohio Dept. ofCommerce (May 24, 1993), Montgomery App. No. 13660, a case involving the presumption of due receipt, we established that a party also must prove that the letter was properly addressed and had sufficient postage in order to avail itself of the presumption. In Blackburn, a security agency asserted that it had timely requested an administrative hearing on a decision by the Licensing Division of the Department of Commerce to revoke the agency's license to operate a security service and private investigation business. The parties agreed that, pursuant to R.C.119.07, requests for a hearing must have been received by the agency within 30 days of the agency's mailing of the notice to Blackburn. Blackburn's office manager presented evidence that he had drafted a letter requesting a hearing, signed the letter, stamped it with a postal machine, and personally mailed it. The agency allegedly never received the letter.
 {¶ 36} On review, we stated that "a presumption of due receipt of a letter or other communication sent through the mails arises upon proof that the letter or other communication (1) was properly addressed, (2) had sufficient postage, and (3) was properly deposited in the mails." Id., citing Simpson v.Jefferson Standard Life Ins. Co., (1972), 465 F.2d 1320, 1323. Although we concluded that Blackburn had satisfied the second and third elements, we noted that the address line of the letter indicated an address which was incorrect in two respects — it had an incorrect zip code and it did not indicate that it was being sent to the Division of Licensing. Thus, we concluded that "[w]hile it is conceivable that the letter could have been delivered despite these minor flaws in the address, a court cannot presume that it was. To obtain the benefits of the presumption, a party must establish that the letter was properly addressed; it is not sufficient to prove that the address was close to being correct." Id.
 {¶ 37} As stated supra, Mrs. Shade's counsel has stated that Dr. Bleser's 180-day notices were sent to 4336 State Route 725, Bellbrook, Ohio, 45305, which is the business address that he had provided during his deposition. Mrs. Shade has provided a copy of the letter to Dr. Bleser in his individual capacity. Dr. Bleser has not refuted that the letter was properly addressed. Moreover, Mrs. Shade's counsel indicated that the letters were properly mailed on July 12, 2002. Although there is no evidence regarding the postage, a trier of fact could reasonably infer that correct postage was affixed, in light of the fact that similar notices to Fidelity, South Dayton, Dr. Lucht, Dr. Schmitz, and MVH were timely delivered. Accordingly, Mrs. Shade has presented sufficient evidence to support a presumption of due delivery. Moreover, because there is no evidence to the contrary (other than Dr. Bleser's statement that he did not receive the notices at all and the lack of a certified mail receipt signed by him), Mrs. Shade has presented sufficient evidence to support the presumption that at least the first class regular mail letter was received no later than July 16, 2002. Consequently, the trial court erred in concluding, as a matter of law, that Mrs. Shade's action against Bellbrook and Dr. Bleser was filed untimely.
 {¶ 38} The assignment of error is sustained.
 {¶ 39} The judgment of the trial court will be reversed, and the cause remanded for further proceedings.
Fain, J., concurs.