[Cite as *Terrago-Snyder v. Mauro*, 2010-Ohio-5524.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| CARIE TERRAGO-SNYDER, et al. | ) | CASE NO. 08 MA 237 |
| | ) | |
| PLAINTIFFS-APPELLEES | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| CAROL MAURO | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:      Civil Appeal from the Court of Common
Pleas of Mahoning County, Ohio
Case No. 2005 CV 580

JUDGMENT:      Affirmed in Part.
Reversed in Part.
Modified.

APPEARANCES:
For Plaintiff-Appellee:      Atty. Patrick C. Fire
721 Boardman-Poland Road
Boardman, Ohio 44512

For Defendant-Appellant:      Atty. Adam E. Carr
The Carr Law Office, LLC
5824 Akron-Cleveland Road, Suite A
Hudson, Ohio 44236

Atty. Curtis J. Ambrosy
Ambrosy & Fredericka
144 North Park Avenue, #200
Warren, Ohio 44481-1124

JUDGES:
Hon. Cheryl L. Waite
Hon. Joseph J. Vukovich
Hon. Mary DeGenaro

Dated: November 12, 2010

WAITE, J.

**{¶1}** This negligence action arose as a result of an automobile accident that occurred on April 7, 2003, when a vehicle driven by Appellant, Carol J. Mauro, struck a vehicle being driven by Appellee, Carie Terrago-Snyder. Catherine Terrago (Carie's mother), and Appellees, Ronald and Dylan Snyder (Carie's then seven year old fraternal twins) were passengers in Carie's car when the accident occurred.

**{¶2}** At trial, Appellant admitted negligence and the only issue before the jury was damages. According to the verdict form, the jury awarded damages in the following amounts: $18,429 to Carie for her medical bills and the medical bills of her children and $7,500 to Carie for pain and suffering; $24,000 to Ronald for pain and suffering, and $182,000 to Ronald for permanent injuries; $9,000 to Dylan for pain and suffering, and $4,000 to Dylan for permanent injuries; and $8,618.22 to Catherine for medical bills and $2,500 to Catherine for pain and suffering. At a post-trial hearing, the trial court granted a motion for prejudgment and post-judgment interest filed on behalf of Carie, Ronald and Dylan.

**{¶3}** Appellant appeals two judgment entries of the Mahoning County Court of Common Pleas: the judgment entry memorializing the $182,000 award for Ronald's permanent injuries and the subsequent judgment entry awarding prejudgment interest to Carie, Ronald, and Dylan.

**{¶4}** Appellant contends that there was insufficient evidence to support Ronald's award for permanent injuries. This argument provides the basis for the first three of Appellant's four assignments of error: the trial court erred when it permitted the jury to award future damages to Ronald; the trial court erred in not granting a

judgment notwithstanding the verdict on the $182,000 award; and the trial court erred when it denied a motion for new trial on the future damage award for Ronald. In her fourth assignment of error, Appellant claims that the trial court erred in awarding prejudgment interest in this case to Carie, Ronald and Dylan.

{¶5} Appellees filed a motion to dismiss the appeal based on App.R. 12, as well as a motion for attorney fees pursuant to App.R. 23, arguing that Appellant's failure to object at trial to the permanent injury verdict form for Ronald waived any challenge to the damages award for Ronald on appeal. Appellees further contend that the appeal of the prejudgment interest award constitutes frivolous conduct on the part of Appellant.

{¶6} Appellant filed a motion to strike the motion to dismiss, arguing that the motion to dismiss constituted a surreply. Appellant argues that the motion to dismiss was filed without leave of this Court, the fourteen page brief violates page limits set forth in App.R. 16(C), and the content of a surreply is limited to new matters raised in the answer brief.

{¶7} For the following reasons, Appellees' motion to dismiss is denied, and the judgment entries of the trial court are affirmed, however the prejudgment interest award is modified to reflect the following amounts pursuant to the current version of R.C. 1343.03: $6,200.73 for Carie; $5,739.43 for Ronald; and $2,152.28 for Dylan.

<u>ASSIGNMENT OF ERROR NO. 1</u>

{¶8} <u>"THE TRIAL COURT ERRED IN PERMITTING THE JURY TO AWARD FUTURE DAMAGES TO APPELLEE RONALD SNYDER, IV."</u>

{¶9}  At trial, Carie sought and was awarded future damages on Ronald's behalf in the amount of $182,000 for permanent injuries based upon chronic headaches, which began approximately one month after the accident, and that Ronald continued to suffer as of the date of trial.  Thomas Yankush, DC, a chiropractor board certified in orthopedics, provided medical testimony on behalf of Appellees at trial.  Appellant asserts that Dr. Yankush was not qualified to express an opinion as to the alleged permanency of Ronald's chronic headaches.  In her first assignment of error, she contends that the trial court erred in instructing the jury on permanent or future damages based upon the lack of qualified medical testimony that Ronald suffered permanent injuries as a result of the accident.

{¶10}  In order to determine the propriety of the future damages instruction, we must determine whether Dr. Yankush was qualified to provide expert testimony regarding Ronald's injuries.  "Expert testimony is needed on complex issues outside the area of common knowledge, such as an injury's cause and effect."  *Polen v. Gilmore* (Sept. 25, 2001), 7th Dist. No. 99 520 CA, *2.  "Except as to questions of cause and effect which are so apparent as to be matters of common knowledge, the issue of the causal connection between an injury and a specific subsequent physical disability involves a scientific inquiry and must be established by the opinion of medical witnesses competent to express such opinion."  Id. citing *Darnell v. Eastman* (1970), 23 Ohio St.2d 13, 17, 261 N.E.2d 114, syllabus.

{¶11}  A trial court's determination of the admissibility of expert testimony is reviewed for abuse of discretion.  *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, at ¶9.  An abuse of discretion suggests

unreasonableness, arbitrariness, or unconscionability. Without those elements, it is not the role of this Court to substitute its judgment for that of the trial court. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶12} " 'Courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met.' " *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶23, quoting *State v. Nemeth* (1998), 82 Ohio St.3d 202, 207, 694 N.E.2d 1332. Evid.R. 702 provides that a witness may testify as an expert if all of the following apply:

{¶13} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

{¶14} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

{¶15} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *"

{¶16} Additionally, Evid.R. 703 provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing."

{¶17} Dr. Yankush stated that he typically treats "musculoskeletal-type problems, and that's like low back, neck injuries, shoulders, knees, things of that nature, elbows," and "orthopedic-type problems." (Trial Tr., p. 190.) According to Dr. Yankush's notes, Ronald presented to him on April 25, 2003 with complaints of neck and back pain. Dr. Yankush diagnosed "cervical and an upper back or a dorsal

sprain/strain type of an injury." (Trial Tr., p. 198.) He explained that a sprain is an injury to a ligament, which is the soft tissue structure that holds the bones together. Sudden force stretches the bones apart and causes damage to the ligament. (Trial Tr., pp. 198-199.) Dr. Yankush diagnosed a moderate strain with "significant muscle spasms, swelling, [and] restriction in motion in the joints." (Trial Tr., pp. 199-200.)

{¶18} The medical records of a pediatric neurologist, Thomas Kalavsky, MD, who did not testify at trial, were admitted as a part of a joint exhibit offered by the parties. Dr. Kalavsky's medical report, dated November 11, 2003, reads, in pertinent part:

{¶19} "**HISTORY OF PRESENT ILLNESS:**

{¶20} "This 8-year-old was referred because of headaches.

{¶21} "On April 7, 2003. In [sic] back seat of car which hit another car. He hit his face on the seat in front of him. He was knocked out briefly. He didn't talk for 3 days. He didn't vomit. Fracture of facial bones. A CT of head – brain normal. When he started to talk he had pain in his left mandible. In May he started getting headaches. They occur almost every day. He has no aura. The pain starts in the left orbital region. The onset is gradual. His 'black eye' comes back out again. The intensity is 5/5. He can't describe the quality. He vomits about 2 / month [sic]. He has no dizziness, rash, or fever. He has no change in vision, hearing, sensation, strength, or speech. They last hours. Light, exertion, noise makes them worse; Sleep, eating peanut butter makes them better. The onset is usually after lunch, in the sun, if playing hard, or playing videogames. The onset is not related to day of week, location, particular meals, meals, position, ambient temperature, or chewing.

Tylenol will help if given early, Motrin makes him vomit, excedrin quick tabs [sic] helps if given early. He hasn't had any recent blood work.

**{¶22}** "Last year he missed a couple weeks of school. He's in the nurse's office for 1-2 hours. He's in regular class 2nd grade. He excels in everything except reading. He hasn't lost any skills. He has a concentration problem. He hasn't had seizures.

**{¶23}** "* * *

**{¶24}** "**IMPRESSION:**

**{¶25}** "The daily headaches sound like muscle traction headaches, which won't respond well to medication but respond to relaxation techniques, like massage, etc.

**{¶26}** "Its not clear if the headaches with vomiting are from the motrin [sic]. If not some of the headaches may be migraine.

**{¶27}** "He probably has a dyslexia which might be worsening his muscle traction headaches." (9/18/08 JNOV Motion, Exh. A.)

**{¶28}** Dr. Yankush treated Ronald over the course of a three week period, and there was no reference to Ronald's headaches in his notes. However, according to Dr. Kalavsky's medical records, Ronald's headaches began approximately one month after the accident, which roughly coincides with the end of Ronald's treatment by Dr. Yankush. Consequently, it is not inconsistent with the testimony provided at trial that the onset of Ronald's headaches occurred after he concluded his treatment with Dr. Yankush.

{¶29} Dr. Yankush conceded that he was not qualified to treat Ronald's facial injuries. (Trial Tr., p. 197.) His notes indicate that he was treating Ronald for neck and upper back pain with heat, "inferential," mobilization, and exercises. He also recommended that Carie purchase arch supports for Ronald. The notes document Ronald's continuous improvement, and the final entry reads:

{¶30} "S: Ronnie is doing pretty good. He doesn't have any real complaints.

{¶31} "O: We have full and pain free neck and trunk ROM. He may still have some sinus things going on and he'll discuss that with his other treating physician.

{¶32} "P: At this time, I'm basically going to effectively see him in one month for a recheck. I want him to stay with his home exercises."

{¶33} Dr. Yankush diagnosed Ronald as suffering from muscle strain as a result of the accident. He testified that muscle traction headaches are a common result of the type of muscle strain suffered as a result of the accident:

{¶34} "Oftentimes following a moderate or severe sprain/strain injury like [Ronald] sustained here to his neck where have you [sic] a sudden force driving your head backwards and forwards, it can create a strain to the muscles. And sometimes these will be nagging or the wax and the wane; they'll come and they'll go. What they'll do is go into a hypertensive state. And particularly at the base of the neck we have what we call suboccipital nerves that come up through these muscles. And sometimes when these muscles get into this spastic or this tension state, it will compress the nerves and you'll get these tension headaches. And that's not uncommon.

{¶35} "* * *

{¶36} "They can typically come up through the back of the head to the forehead to the facial region." (Trial Tr., p. 202.)

{¶37} Dr. Yankush testified that he commonly treats muscle traction headaches, and that the treatment includes ice, heat, muscle stimulation, and manipulation. (Trial Tr., pp. 204-205.) Based on Ronald's age at the time of the injury, and the fact that Ronald continued to suffer headaches up to the date of the trial, Dr. Yankush further testified that there was a "certain degree of permanency" to Ronald's injuries. (Trial Tr., p. 204.) Dr. Yankush's testimony was uncontroverted, as Appellant provided no expert medical testimony.

{¶38} Carie testified that Ronald frequently vomited as a result of the headaches. (Trial Tr., pp. 284, 288, 307.) She testified that the headaches "started to ease up" when Ronald was in the fourth grade. (Trial Tr., p. 287.) Ronald testified that the headaches lessened in severity and frequency over time, and that, at the time of trial, he suffered a headache about three times a month. (Trial Tr., p. 326.) He stated that when he can sense the onset of a headache he can treat it before it strikes. However, on the occasions when the onset is unavoidable, he will typically vomit and he is usually forced to go to bed. (Trial Tr., p. 328.)

{¶39} The permanent injury jury instruction read in pertinent part:

{¶40} "[E]xcept for the plaintiff Catherine Terrago, each of the plaintiffs claim their injuries are permanent and that they will experience pain and disability in the future. Now, as to such claim, damages may be found by you which are reasonably certain to exist in the future as the proximate result of this accident and as proven by the evidence.

**{¶41}** "If you find from the greater weight of the evidence that as a proximate cause of the injuries sustained the plaintiffs have suffered a permanent disability which is evidenced by way of the inability to perform the usual activities of life such as the basic mechanical body movements of walking, climbing stairs, feeding oneself, driving a car and so forth, or by way of the inability to perform the particular plaintiff's usual specific activities which had given pleasure to these individual plaintiffs, you may consider and make a separate award for such damages." (Trial Tr., pp. 457-458.)

**{¶42}** The jury was given a verdict form that included lines captioned "Pain and suffering to date" and "Permanent injuries" for Ronald.

**{¶43}** Appellant's argument in the first assignment of error is twofold: first, Dr. Yankush did not treat Ronald for his headaches; second, Dr. Yankush is not qualified to offer expert testimony on Ronald's headaches. With respect to Appellant's first argument, a non-treating physician's expert testimony is not entitled to any less weight than that of a treating physician. *Coulter v. Stutzman*, 10th Dist. No. 07AP-1081, 2008-Ohio-4184, ¶15. With respect to the second argument, a prospective witness does not have to be the best witness on the topic to qualify as an expert. *Haney v. Barringer,* 7th Dist. No. 06MA141, 2007-Ohio-7214, ¶37, citing *Ishler v. Miller* (1978), 56 Ohio St.2d 447, 453, 384 N.E.2d 296.

**{¶44}** A potential expert must demonstrate knowledge greater than that possessed by an average juror. Id., citing *State Auto Mut. Ins. Co. v. Chrysler Corp.* (1973), 36 Ohio St.2d 151, 160, 304 N.E.2d 891. Dr. Yankush testified on direct examination that he sees and treats patients with muscle traction headaches in the

course of his practice. His testimony established that the muscle strain in the neck suffered by Ronald as a result of the accident is a common cause of muscle traction headaches. Dr. Yankush's testimony further established that Ronald's headaches would be an ongoing problem. Accordingly, the trial court did not abuse its discretion in admitting his testimony. Appellant provided no expert testimony to refute Dr. Yankush's testimony, and Dr. Yankush did not contradict his own testimony on cross examination.

**{¶45}** Turning to Appellant's argument that the trial court erred when it instructed the jury on future damages, it is important to note that her trial counsel did not object to the future damages instruction or the verdict form. "Absent plain error, a party waives any challenge to jury instructions in a civil case unless that party 'objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection .' " *Sayavich v. Creatore*, 7th Dist. No. 07-MA 217, 2009-Ohio-5270, ¶101, citing Civ.R. 51(A).

**{¶46}** "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099, at paragraph one of the syllabus.

**{¶47}** In *Goldfuss*, the Court explained that the doctrine shall only be applied in extremely unusual circumstances where the error complained of, if left

uncorrected, would have a material adverse effect on the character of and public confidence in judicial proceedings. Id. at 121, 679 N.E.2d 1099. The Court concluded that the public's confidence is rarely upset merely by forcing civil litigants to live with the errors they themselves or the attorney chosen by them committed at trial. Id. at 121-122, 679 N.E.2d 1099.

{¶48} Generally, requested jury instructions should be given if they are a correct statement of the law as applied to the facts in a given case. *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 575 N.E.2d 828. "[A] court's instructions to the jury should be addressed to the actual issues in the case as posited by the evidence and the pleadings." *State v. Guster* (1981), 66 Ohio St.2d 266, 271, 421 N.E.2d 157. Because Dr. Yankush provided uncontroverted evidence that Ronald's reoccurring headaches were a permanent condition, the trial court did not commit plain error in instructing the jury on future damages. As a consequence, Appellant's first assignment of error is overruled.

ASSIGNMENT OF ERROR NO. 2

{¶49} "THE TRIAL COURT ERRED IN FAILING TO ISSUE JUDGMENT NOTWITHSTANDING THE VERDICT TO ELIMINATE THE $182,000 IN FUTURE DAMAGES FROM THE AWARD TO APPELLEE RONALD SNYDER, IV."

{¶50} In her second assignment of error, Appellant challenges the trial court's decision denying her motion for judgment notwithstanding the verdict, in which she moved the trial court to eliminate the $182,000 future damages award. A trial court must grant a motion for a judgment notwithstanding the verdict if, upon construing the evidence most strongly in favor of the party against whom the motion is directed,

finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party. *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 137, 447 N.E.2d 1145.

**{¶51}** When engaging in this analysis, a court must neither weigh the evidence nor evaluate the credibility of witnesses. *Malone v. Courtyard by Marriott L.P.* (1996), 74 Ohio St.3d 440, 445, 659 N.E.2d 1242. "Rather, the court is confronted solely with a question of law: Was there sufficient material evidence presented at trial on this issue to create a factual question for the jury?" Id. We review a trial court's ruling on a motion for JNOV de novo. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 969 N.E.2d 835, ¶4.

**{¶52}** As stated in our analysis of the first assignment of error, Dr. Yankush's uncontroverted testimony established that Ronald suffered muscle strain in his neck as a result of the accident, muscle strain is a common cause of muscle traction headaches, and Ronald's headaches would be an ongoing problem. Dr. Yankush's testimony was sufficient to create a factual question for the jury regarding the permanency of Ronald's injuries. Therefore, Appellant's second assignment of error is overruled.

ASSIGNMENT OF ERROR NO. 3

**{¶53}** <u>"THE TRIAL COURT ERRED IN FAILING TO ORDER A NEW TRIAL ON THE ISSUE OF FUTURE DAMAGES FOR APPELLEE RONALD SNYDER, IV."</u>

**{¶54}** In her third assignment of error, Appellant claims that the trial court erred in denying her motion for a new trial. The purpose of Civ.R. 59(A), captioned:

"New trials," is to empower the trial court to prevent a miscarriage of justice. *Malone* at 448. "Civ.R. 59 allows, rather than mandates, a trial court to grant a new trial * * *." *Sims v. Dibler*, 7th Dist. No. 05 JE 53, 172 Ohio App.3d 486, 2007-Ohio-3035, 875 N.E.2d 965, ¶31, citing *Eagle Am. Ins. Co. v. Frencho* (1996), 111 Ohio App.3d 213, 218, 675 N.E.2d 1312.

**{¶55}** Civ. R. 59(A) reads, in pertinent part:

**{¶56}** "A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:

**{¶57}** "* * *

**{¶58}** "(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;

**{¶59}** "* * *

**{¶60}** "(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;

**{¶61}** "(7) The judgment is contrary to law;

**{¶62}** "* * *

**{¶63}** "(9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application * * *"

**{¶64}** A court of appeals must affirm the decision of a trial court to deny a new trial unless there is an abuse of discretion. *Jones v. Booker* (1996), 114 Ohio App.3d 67, 682 N.E.2d 1023. An abuse of discretion implies a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore* at 219, 450 N.E.2d 1140.

**{¶65}** When a trial court's decision on a motion for a new trial involves a question of fact, a reviewing court must view the evidence in a light favorable to the trial court's decision. *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 351, 504 N.E.2d 19, citing *Jenkins v. Krieger* (1981), 67 Ohio St.2d 314, 320, 423 N.E.2d 856. When a trial court's decision on a motion for new trial involves a question of law, no deference is afforded. *Wagner v. Roche Laboratories* (1999), 85 Ohio St.3d 457, 460, 709 N.E.2d 162.

**{¶66}** In her motion for new trial, Appellant argued that the jury verdict was against the manifest weight of the evidence. Pursuant to a civil manifest weight of the evidence standard of review, a reviewing court should defer to the judgment of the trial court in factual determinations, and "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court." *Creative Concrete v. D & G Pools*, 7th Dist No. 07 MA 163, 2008-Ohio-3338, ¶17, quoting *C.E. Morris v. Foley Construction Co.* (1978) 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578 St.3d 12, 19, 526 N.E.2d 1350.

**{¶67}** As stated earlier, Dr. Yankush's testimony constituted competent, credible evidence that Ronald's headaches constituted a permanent injury resulting from the accident. Appellant adduced no evidence to the contrary. Consequently, Appellant's manifest weight of the evidence argument lacks merit.

**{¶68}** Appellant's contention that the verdict was contrary to law and the result of an error of law is also predicated on Dr. Yankush's qualifications to provide expert testimony. As we have previously concluded that the trial court did not abuse its

discretion in admitting Dr. Yankush's testimony in this case, these arguments must also fail.

**{¶69}** Finally, Appellant argued that the future damages awarded to Ronald were excessive based upon a lack of competent medical testimony, the admission of photographs of Ronald after the accident, and statements made by Appellees' trial counsel during closing argument. Once again, as we have concluded that the trial court did not abuse its discretion in admitting Dr. Yankush's testimony, there is no basis for Appellant's assertion that the damage award was excessive due to a lack of competent medical testimony.

**{¶70}** However, Appellant also contends that Ronald's permanent injury award was based on inappropriate statements made by Appellees' trial counsel during closing argument and photographs of Ronald's injuries, rather than properly admitted expert medical testimony as required by Ohio law. Appellant relies upon statements made during closing arguments that Ronald had a sinus injury, that he would need surgery on a deviated septum in the future, and that he would not be able to fly an airplane (Ronald had testified that he wanted to be an airline mechanic). She also relies upon photographs admitted into evidence to argue that the jury's permanent injury award was predicated upon statements unsupported by the evidence, and photos "depicting a sorrowful seven-year-old boy with his face severely swollen after the accident," rather than the evidence adduced at trial. (Appellant's Brf., p. 14.)

**{¶71}** Appellant did not object to the introduction of the photos or the statements made in closing arguments at trial. As such, Appellant must once again

demonstrate that the admission of the photographs and statements during closing argument constitute plain error. As stated earlier, the plain error doctrine is disfavored and may be applied only in the extremely rare case involving exceptional circumstances where the error "seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process." *Goldfuss*, supra.

{¶72} Appellant filed supplemental authority and second supplemental authority in support of her excessive damages argument. In *State ex. rel. Cambridge Health Care Inc. v. Industrial Commission of Ohio,* 124 Ohio St.3d 477, 2010-Ohio-651, 923 N.E.2d 1141, the Ohio Supreme Court held that a physical therapist's report is insufficient, on its own, to support an award of loss-of-use workers' compensation benefits, and that such a report may be considered only in conjunction with a doctor's report to determine the severity of a disability. Id. at ¶7, 17. The evidence in the case sub judice does not include a physical therapist's report, therefore *Cambridge Health Care* is inapposite. Appellant's counsel conceded at oral argument that chiropractors are not treated by the same standards as physical therapists in Ohio.

{¶73} In *Maggio v. City of Cleveland* (1949), 151 Ohio St. 136, 84 N.E.2d 912, the Ohio Supreme Court held that remarks by plaintiff's counsel in opening statement regarding a personal-injury plaintiff's children and her mentally ill husband, as well as a description of the previous accident responsible for her husband's illness were improper. The Court relied on Ohio law that evidence of a plaintiff's dependents is incompetent for the reason that such evidence tends to enhance the damages award beyond the legally recoverable sum. There was no evidence suggesting that Ronald

had dependents that relied upon him for their case and support, so *Maggio* is also inapposite.

**{¶74}** In *Hayes v. Smith* (1900), 62 Ohio St. 161, 56 N.E.2d 879, a dog owned by Hayes attacked a horse pulling a buggy owned and occupied by Smith, which caused the buggy to overturn and severely injure Smith. Smith argued that Hayes was aware of the dog's vicious nature and propensity for attacking horses attached to wagons. The *Hayes* Court reversed the trial court's denial of the motion for new trial for several reasons, including the use of hypotheticals during cross-examination, and accusations by Smith's counsel before the jury that Hayes' counsel was attempting to suppress the truth. It appears that Appellant is relying upon *Hayes* for the proposition that trial counsel's attack on opposing counsel during argument was grounds for a new trial. However, the closing argument in this case did not result in the manifest prejudice found in *Hayes*.

**{¶75}** Simply stated, none of the cases cited by Appellant as supplemental authority have convinced us that the admission of the photographs or the statements of Appellant's trial counsel during closing arguments constitute plain error under the civil plain error standard. Accordingly, Appellant's third assignment of error is overruled.

ASSIGNMENT OF ERROR NO. 4

**{¶76}** "THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING PREJUDGMENT INTEREST."

**{¶77}** The ultimate decision to award prejudgment interest is reposed in the trial judge and the standard of review on appeal is abuse of discretion. *Ziegler v.*

*Wendel Poultry Serv., Inc.* (1993), 67 Ohio St.3d 10, 20, 615 N.E.2d 1022, 1032.

Prejudgment interest awards are governed by R.C. 1343.03(C). The current version

of the statute, amended June 4, 2004, reads, in its entirety:

**{¶78}** "(C)(1) If, upon motion of any party to a civil action that is based on

tortious conduct, that has not been settled by agreement of the parties, and in which

the court has rendered a judgment, decree, or order for the payment of money, the

court determines at a hearing held subsequent to the verdict or decision in the action

that the party required to pay the money failed to make a good faith effort to settle the

case and that the party to whom the money is to be paid did not fail to make a good

faith effort to settle the case, interest on the judgment, decree, or order shall be

computed as follows:

**{¶79}** "(a) In an action in which the party required to pay the money has

admitted liability in a pleading, from the date the cause of action accrued to the date

on which the order, judgment, or decree was rendered;

**{¶80}** "(b) In an action in which the party required to pay the money engaged

in the conduct resulting in liability with the deliberate purpose of causing harm to the

party to whom the money is to be paid, from the date the cause of action accrued to

the date on which the order, judgment, or decree was rendered;

**{¶81}** "(c) In all other actions, for the longer of the following periods:

**{¶82}** "(i) From the date on which the party to whom the money is to be paid

gave the first notice described in division (C)(1)(c)(i) of this section to the date on

which the judgment, order, or decree was rendered. The period described in division

(C)(1)(c)(i) of this section shall apply only if the party to whom the money is to be paid

made a reasonable attempt to determine if the party required to pay had insurance coverage for liability for the tortious conduct and gave to the party required to pay and to any identified insurer, as nearly simultaneously as practicable, written notice in person or by certified mail that the cause of action had accrued.

**{¶83}** "(ii) From the date on which the party to whom the money is to be paid filed the pleading on which the judgment, decree, or order was based to the date on which the judgment, decree, or order was rendered.

**{¶84}** "(2) No court shall award interest under division (C)(1) of this section on future damages, as defined in section 2323.56 of the Revised Code, that are found by the trier of fact."

**{¶85}** The 2004 amendments to the statute served to limit prejudgment interest awards. The amended statute prohibits prejudgment interest awards predicated on future damages, which were permissible under the previous law. The current version of the statute mandates that prejudgment interest awards date back to the day that the cause of action accrued only where liability was admitted in a pleading or the injury was the result of intentional conduct, while the old statute mandated that prejudgment interest awards date back to the day that the cause of action accrued without limitation.

**{¶86}** Appellant argues that the amended statute should apply in this case, citing our decision in *Scibelli v. Pannunzio*, 7th Dist. No. 05 MA 150, 2006-Ohio-5652. In *Scibelli,* the plaintiff filed his complaint prior to the effective date of the 2004 amendment to the prejudgment interest statute. Applying the test articulated in *Van Fossen v. Babcock & Wilson Co.* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489, we

concluded that the General Assembly did not intend that the amendment to subsection (C) of the statute should be applied retroactively to pending cases. *Scibelli* at ¶149.

**{¶87}** The *Scibelli* Court specifically rejected the argument raised by Appellees in the case sub judice, that the legislature intended a retroactive application of the entire statute based upon uncodified law that specifically addressed the retroactive application of subsection (A) of the statute. This Court held that the uncodified law addressing the interest rate provision was "a contraindicator of legislative intent to make other divisions retroactive." Id. at ¶147.

**{¶88}** Here, the accident occurred prior to the statutory amendments, but the complaint was filed after the effective date of the amended statute. The trial court awarded prejudgment interest on the entire award dating back to the date of the accident. In this case, Appellant did not admit liability in a pleading, nor is there any evidence that she deliberately caused Appellees' injuries. Based upon our decision in *Scibelli*, the trial court erred when it applied the previous version of the statute in fashioning the prejudgment interest award.

**{¶89}** According to the current statute, Appellees' prejudgment interest award is limited to the damages award for medical bills and pain and suffering. Further, as there is no evidence that Appellees gave "first notice," as that term is defined by the statute, prejudgment interest runs from the date that the complaint was filed.

**{¶90}** Turning to the substantive issues, the Ohio Supreme Court has held that there are four requirements to an award of prejudgment interest: (1) a timely motion within 14 days after judgment; (2) a hearing on the motion; (3) a finding by the

court that the party required to pay failed to make a good faith effort to settle; and (4) a finding by the court that the party to whom the judgment is to be paid made a good faith effort to settle. *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 658, 635 N.E.2d 331.

**{¶91}** The trial court must exercise its discretion to determine whether a party acted in good faith or failed to make a good faith effort to settle. Id. If the record contains competent, credible evidence supporting the trial court's decision, there is no abuse of discretion. *Patterson v. Colla*, 7th Dist. No. 03-MA-18, 2004-Ohio-3033, at ¶44. The burden of proof is on the party seeking prejudgment interest. *Moskovitz* at 659, 635 N.E.2d 331.

**{¶92}** Lack of good faith is not the same as bad faith. Id. The Ohio Supreme Court has defined what constitutes lack of a good faith effort in the negative:

**{¶93}** "A party has not 'failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer." *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 495 N.E.2d 572, at the syllabus.

**{¶94}** The *Moskovitz* Court added that the last sentence of the *Kalain* syllabus should be strictly construed so as to carry out the purposes of R.C. 1343.03(C). *Moskovitz*, 69 Ohio St.3d at 659, 635 N.E.2d 331. The purposes of R.C. 1343.03(C)

are " 'to promote settlement efforts, to prevent parties who have engaged in tortious conduct from frivolously delaying the ultimate resolution of cases, and to encourage good faith efforts to settle controversies outside a trial setting.' "   Id. at 658, 635 N.E.2d 331, quoting *Kalain* at 159, 495 N.E.2d 572.

**{¶95}** At the hearing on the motion for prejudgment interest, Appellees' trial counsel stated that a demand for $12,000 was made on behalf of Carie, a demand of $25,000 for Dylan, and a demand of $45,000 for Ronald.  (Hrg. Tr., p. 11.)  An offer of $8,000 was made to Carie, and an offer of $11,199 was made to Dylan, but no offer was made to Ronald until the final pretrial conference.  (Hrg. Tr., p. 11.)

**{¶96}** There was no movement from the original offers to Carie and Dylan at a court-ordered mediation held in July of 2006, and no response was provided to a letter that Appellees' counsel sent to the adjuster in December of 2007.  (Hrg. Tr., pp. 8-9.)  The letter set forth a history of Appellees' injuries and their respective medical bills, as well as a reduced demand intended to evoke a settlement.

**{¶97}** According to Appellees' counsel, he fulfilled his duty to document the extent of Ronald's injuries, and ongoing medical problems, because he assumed that some offer would be made.  He claims that he was never approached for additional documentation regarding Ronald's injuries.  (Hrg. Tr., p. 10.)

**{¶98}** At the final pretrial conference, which was conducted four days before the trial, the adjuster offered $1,152 for Ronald.  (Hrg. Tr., p. 12.)  According to Appellees' trial counsel, the adjuster stated that Ronald's dental records had not been made available to her.  (Hrg. Tr., p. 12.)

{¶99} According to Appellees' trial counsel, Appellant's trial counsel conceded that, with $5,008 in medical bills, a larger settlement offer should have been made. (Hrg. Tr., pp. 12-13.) On the day of trial, an offer of $11,592 was made to Ronald. According to Appellees' trial counsel, Appellant's trial counsel conceded that, with Ronald's ongoing headaches, a larger settlement offer would have been expected. (Hrg. Tr., p. 13.)

{¶100} Appellant's trial counsel did not appear at the hearing on the motion for prejudgment interest. The attorney who attended the hearing on behalf of Appellant was an associate at her trial counsel's law firm, and he explained that it was the standard procedure of the firm to assign new counsel for post-trial motions and appeals. (Hrg. Tr., p. 3.) Appellees' trial counsel attempted to call the adjuster as a witness at the hearing, but was told that she had a sick child who was hospitalized and that she could not attend. (Hrg. Tr., pp. 11-12.)

{¶101} Appellant's counsel sought to continue the hearing due to the unavailability of the adjuster and Appellant's trial counsel, and objected to the trial court's reliance on any statements allegedly made by them, which he argued constituted hearsay. (Hrg. Tr., p. 40.)

{¶102} The claims file revealed that Appellant's insurance company had placed $25,000 in reserve for Ronald, $5,000 for Carie, and $5,000 for Dylan. According to Appellees' trial counsel, medical authorizations were provided to Appellant's trial counsel and the adjuster, as well as medical records for each of the injured parties. (Hrg. Tr., p. 8.) Appellant's counsel argued that the reserves were

irrelevant, because Appellees' counsel had failed to explain their relevance to the claims, and, in fact, that they merely serve a bookkeeping function.

**{¶103}** Appellant's counsel argued that Appellees never provided complete information regarding their injuries. More specifically, he argued that there was no evidence of the permanency of Ronald's injuries prior to trial. (Hrg. Tr., p. 34.) He further argued that Appellees' trial counsel requested three continuances during the course of the lawsuit.

**{¶104}** At the hearing on the motion for prejudgment interest, the trial court concluded that the pretrial offer made by Appellant was "absolutely almost insulting." (Hrg. Tr., pp. 51-52.) The trial court recalled that, at numerous pretrial conferences, there was no offer made to Ronald, despite photographs detailing his injuries. The court expressed particular concern that the adjuster had not made an offer that would cover the medical bills in this case. (Hrg. Tr., p. 51.) Ultimately, the trial court characterized the settlement offer as an act of bad faith on the part of Appellant's insurer. (Hrg. Tr., p. 52.)

**{¶105}** Evidently, the trial court credited the rendition of the settlement negotiations provided by Appellees' trial counsel. The court did not accept Appellant's assertion that she was ambushed by Ronald's claim for permanent injuries at trial or that Appellant's insurance company was not provided complete medical records prior to trial. The trial court also rejected Appellant's claim that Appellees were responsible for pretrial delay due to their motions to continue the trial. According to the docket, the trial was continued twice due to the unavailability of the trial court. Appellees filed two motions to continue pretrials, but neither resulted in

undue delay. Thus, competent, credible evidence exists supporting the trial court's decision, and there is no abuse of discretion. *Patterson*, supra.

**{¶106}** Therefore, Appellant's fourth assignment of error is sustained in part, and overruled in part. There is sufficient evidence to support the award of prejudgment interest in this case, however, the amounts awarded are modified pursuant to the current version of R.C. 1343.03 as follows:

**{¶107}** Carie: prejudgment interest in the amount of $6,200.73 for a total award of $32,129.73;

**{¶108}** Ronald: prejudgment interest in the amount of $5,739.43 for a total award of $211,739.43;

**{¶109}** Dylan: prejudgment interest in the amount of $2,152.28 for a total award of $15,152.28.

Vukovich, P.J., concurs.

DeGenaro, J., concurs.